### NEW YORK, NEW HAVEN & HARTFORD R. CO. v. LEARY.

#### No. 4699.

United States Court of Appeals
First Circuit.

May 14, 1953.

462

Noel W. Deering, Boston, Mass. (Charles W. Bartlett, John O. Parker and Ely, Bartlett, Thompson & Brown, Boston, Mass., on brief), for appellant.

John V. Higgins, New York City (Thomas J. O'Neill, New York City, Joseph P. Coughlin, Cambridge, Mass., and O'Neill, Higgins & Latto, New York City, on brief), for appellee.

Before MAGRUDER, Chief Judge, and WOODBURY and HARTIGAN, Circuit Judges.

HARTIGAN, Circuit Judge.

This is an appeal from a judgment entered in the United States District Court for the District of Massachusetts on July 2, 1952, based upon a jury verdict in an action brought under the Federal Employers' Liability Act, 45 U.S.C.A. § 51 et seq., and the Safety Appliance Acts, 45 U.S.C.A. § 1 et seq.

By agreement of counsel, the case was submitted to the jury only upon the issue of the alleged violation of the Safety Appliance Acts, causation and damages. On July 2, 1952, after the defendant's motion for a directed verdict was denied, the jury returned a verdict for plaintiff in the sum of $84,000. Defendant's motions for judgment notwithstanding the verdict and for a new trial were denied on July 21, 1952.

The plaintiff, John W. Leary, a conductor for the appellant railroad, sought recovery for injuries sustained when he fell from an open-sided trestle bridge to the highway below between Clinton and Madison, Connecticut, at about 3:30 a.m. on the morning of September 12, 1946. Leary was working on the Boston to New York passenger train which left Boston at 11:45 on the night of September 11, 1946. After the train passed the station at Clinton trouble with the air brake developed causing the train to stop, concededly because of a defective air hose. When it stopped, the front part of the locomotive was resting on the trestle over a highway.

Leary was riding in the head coach immediately to the rear of the baggage car. When he heard the brakes go on hard in emergency, and the train came to a stop, he went outside, carrying his electric lantern. As he stepped down to the ground, he met the engineer walking back from the engine with a lighted kerosene torch in hand. The engineer told him there was a bad air leak, and they then walked back together towards the rear to find it.

When they heard air escaping, they walked through a vestibule to the other side of the train and found a broken air hose on the head end of the head sleeper. Leary then "went up to the engine to get the regulation air hose" and after he got it, started to walk around the head of the engine so as to go back on the other track.[1]

Leary testified that he "probably took half a dozen steps, I don't know, and I just walked right into space." There is testimony that "the weather was clear but it was kind of in a valley and there was a heavy ground fog and it was very dark." There was no artificial light in the vicinity except a glare that came from the ashcan of the engine. At the time of the accident, Leary was carrying his electric hand lantern with a bulb in the bottom, and he testified that as he walked he was looking down to see where each foot was going, since he could not see any distance in front.

Scanlon, a fireman for the railroad, testified that he was still on the engine when Leary fell and that he heard him crying for help and "went down the gangway on the engineer's side and ran toward the direction of the cry. * * * I got over to the edge of the bridge and I stopped myself in time. Looked down and saw Leary on the street below."

Appellant contends that there was insufficient evidence to submit to the jury either the question of the violation of the Safety Appliance Acts or the question whether or not such violation was the proximate cause of Leary's injuries. Furthermore, appellant contends that it was prejudiced because the charge to the jury failed to explain the difference between legal condition and legal causation and because the trial judge erroneously excluded evidence that the plaintiff was receiving certain disability payments.

With regard to the violation of the Safety Appliance Acts, appellant's contention is that §§ 1 and 9 of the Acts do not impose an absolute duty upon the railroad. It maintains that in addition to a showing that the air hose burst, it is also necessary

---

1. Leary testified in part:
"I went up to the engine. I took the one he brought down, the spreader, and I went up to the engine to get the regulation air hose.

"When I got up to the head end of the baggage car, the tool box was on the right hand side of the engine so I climbed between the tank of the engine and head of the head baggage car and I got down and the fireman stuck his head out of the gangway and he said 'What do you want, Jack' and I said, 'I have to have another hose.' He said, 'I got one up here' and I said, 'All right' so I walked up to the gangway of the engine and he handed me one hose and I handed him the other.

"Q. Before you go any further I want to ask you this: When you left the place where they took off the hose to go back toward the engine did you go back on the same side you had come down on? A. No, I went up on track 2 side on account of the bad walking on the engineer's side.

"Q. Tell us now what you mean, what you noticed about the bad walking on the engineer's side when you were walking down from the engine to the place opposite where the hose was broken. A. Well, there was a lot of loose ballast there. The track—there was a lot of that spread all around. In other words, the track looked as though there had been new work done and it wasn't properly trimmed.

*     *     *     *     *

"When a track is properly trimmed there is a space to walk. There is a space on the other side. The rock ballast is, what they call the shoulder of it, is up there and over here is clear ground.

"There was a lot of loose rock ballast and it was hard walking. That is why I walked up on track 2 side I walked up on the ties, it was better walking, more level, solid footing.

"Q. Was there solid footing on that side? A. On track 2?

"Q. On the place where you came down? A. No, bad walking."

to show that the defect was attributable to negligence on the part of the railroad.

This argument is based primarily on a difference in the language employed to define the various safety requirements of the Acts. The appellant asserts that language like "secure sill steps and efficient hand brakes" in § 11 is mandatory whereas the absence of any such adjectives in §§ 1 and 9 shows that only the ordinary duty of care is intended to be imposed.

Appellant argues that the statement in Coray v. Southern Pacific Co., 1949, 335 U.S. 520, 522, 69 S.Ct. 275, 276, 93 L.Ed. 208, that the Safety Appliance Act " * * * commands railroads not to run trains with defective brakes. * * *" does not apply to air brakes. It is argued that the citations offered in support of this statement show that the Supreme Court was thinking only of certain sections which are mandatory or of cases where the defect in the air brake was clearly negligence. Therefore, the Coray case is distinguished from the instant case on the ground that here we are not concerned with a defective coupler, Louisville & Nashville R. R. Co. v. Layton, 1917, 243 U.S. 617, 37 S.Ct. 456, 61 L.Ed. 931, or with a defective grab iron, Davis v. Wolfe, 1923, 263 U.S. 239, 44 S.Ct. 64, 68 L.Ed. 284; Brady v. Terminal R. R. Ass'n, 1938, 303 U.S. 10, 58 S.Ct. 426, 82 L.Ed. 614, which apply to mandatory sections imposing an absolute duty. Nor, it is said, did the Coray opinion intend us to be governed in this case by a decision that violation was conclusive of negligence when air brakes were not hooked up at all, Fairport, P. & E. R. Co. v. Meredith, 1934, 292 U.S. 589, 54 S.Ct. 826, 78 L.Ed. 1446, or when trains collided because brakes failed to work. Spokane & Inland E. R. R. Co. v. Campbell, 1916, 241 U.S. 497, 36 S.Ct. 683, 60 L.Ed. 1125.

We think that the Coray case does not warrant us in reading §§ 1 and 9 [2] with regard to the requirement of safe brakes as the appellant would have us read it. The Coray opinion indicates that the Supreme Court was doing more than merely applying the standard for hand brakes under § 11 [3] when it said: "We do not view the Act's purpose so narrowly. * * * And this Act, fairly interpreted, must be held to protect all who need protection

---

**2.** 45 U.S.C.A. § 1 provides:

"*Driving-wheel brakes and appliances for operating train-brake system*

"It shall be unlawful for any common carrier engaged in interstate commerce by railroad to use on its line any locomotive engine in moving interstate traffic not equipped with a power driving-wheel brake and appliances for operating the train-brake system, or to run any train in such traffic that has not a sufficient number of cars in it so equipped with power or train brakes that the engineer on the locomotive drawing such train can control its speed without requiring brakemen to use the common hand brake for that purpose. Mar. 2, 1893, c. 196, § 1, 27 Stat. 531."

45 U.S.C.A. § 9 provides in part:

"*Number of cars to be operated with power or train brakes; increase of number*

"Whenever, as provided in sections 1–7 of this title, any train is operated with power or train brakes not less than 50 per centum of the cars in such train shall have their brakes used and operated by the engineer of the locomotive drawing such train; and all power-braked cars in such train which are associated together with said 50 per centum shall have their brakes so used and operated; * * * "

**3.** 45 U.S.C.A. § 11 provides:

"*Safety appliances required for each car; when hand brakes may be omitted*

"It shall be unlawful for any common carrier subject to the provisions of sections 1–16 of this title to haul, or permit to be hauled or used on its line, any car subject to the provisions of said sections not equipped with appliances provided for in sections 11–16 of this title, to wit: All cars must be equipped with secure sill steps and efficient hand brakes; all cars requiring secure ladders and secure running boards shall be equipped with such ladders and running boards, and all cars having ladders shall also be equipped with secure handholds or grab irons on their roofs at the tops of such ladders: *Provided*, That in the loading and hauling of long commodities, requiring more than one car, the hand brakes may be omitted on all save one of the cars while they are thus combined for such purpose. Apr. 14, 1910, c. 160, § 2, 36 Stat. 298."

from dangerous results due to maintenance or operation of congressionally prohibited defective appliances. * * * Liability of a railroad under the Safety Appliance Act for injuries inflicted as a result of the Act's violation follows from the unlawful use of prohibited defective equipment * * *. In this case where undisputed evidence established that the train suddenly stopped because of defective airbrake appliances, petitioner was entitled to recover if this defective equipment was the sole or a contributory proximate cause of the decedent employee's death. * * *" Coray v. Southern Pacific Co., 1949, 335 U.S. 520, 522, 523, 69 S.Ct. 275, 276.

We think that this language places air brakes in the same category with couplers and grab irons. Subsequent to the Coray decision, in O'Donnell v. Elgin, J. & E. R. Co., 1949, 338 U.S. 384 at page 394, 70 S.Ct. 200, at page 206, 94 L.Ed. 187, the court said: "* * * we hold that the plaintiff was entitled to a peremptory instruction that to equip a car with a coupler which broke in the switching operation was a violation of the Act, which rendered defendant liable for injuries proximately resulting therefrom, and that neither evidence of negligence nor of diligence and care was to be considered on the question of this liability." Carter v. Atlanta & St. A. B. R. Co., 1949, 338 U.S. 430, 70 S.Ct. 226, 94 L.Ed. 236 and Affolder v. N. Y., C. & St. L. R. Co., 1950, 339 U.S. 96, 98, 70 S.Ct. 509, 94 L.Ed. 683 emphasized this holding. The language and purposes of §§ 1 and 9 do not warrant us in treating air brakes differently from couplers.

Having determined that the existence of a defective air brake in this case was all that plaintiff had to show in order to submit the violation of the Act to the jury, we must next consider whether the evidence warranted submission of the case to the jury on the issue of so-called legal causation.

The question presented is whether or not a jury could reasonably find that Leary's fall from the trestle was within the risk created by the defective air brake. Cf. Boston & M. R. R. v. Cabana, 1 Cir., 148 F.2d 150, certiorari denied, 1945, 325 U.S. 873, 65 S.Ct. 1414, 89 L.Ed. 1991. We do not read the Coray decision as enlarging the function of the jury in Federal Employers' Liability Act cases. It is not for the jury to decide in every case whether an injury is within the risk. The instant case is close.

In Brady v. Southern Ry. Co., 1943, 320 U.S. 476, 483, 484, 64 S.Ct. 232, 236, 88 L.Ed. 239, the Supreme Court asserted that "Events too remote to require reasonable prevision need not be anticipated * * *" and that the "* * * carrier's negligence must be a link in an unbroken chain of reasonably foreseeable events." In that case, during a switching operation, derailed cars killed plaintiff's husband when an improperly closed derailer and a defective rail opposite combined to throw him under the wheels. A directed verdict for defendant in a state court was affirmed on the ground that the accident was not "a danger reasonably to be anticipated." It was held that although maintenance of the defective rail may have been negligent, without the concurrence of the closed derailer the accident would not have happened. Since there was insufficient evidence of negligence in closing the derailer, and since the record disclosed that a closed derailer in such a situation was very unusual, it was not reasonable to say that the derailment was within the risk created by negligent maintenance of a defective rail.

This is the crucial precedent for determination of the issue before us. But see Griswold v. Gardner, 7 Cir., 155 F.2d 333, certiorari denied, 1946, 329 U.S. 725, 67 S.Ct. 74, 91 L.Ed. 628. The appellant quite properly distinguished the Coray case on the ground that the question of causation in the facts of that case was a great deal clearer than in the instant case. Coray only held that it was for the jury to decide whether or not an accident produced by a sudden stop was as much a danger from bad brakes as was an accident produced by a failure to stop. This was merely a recognition of the traditional jury function to decide just what the danger is in a particular set of facts. See Lillie v.

Thompson, 1947, 332 U.S. 459, 68 S.Ct. 140, 92 L.Ed. 73; Korte v. New York, N. H. & H. R. Co., 2 Cir., 1951, 191 F.2d 86, certiorari denied, 1951, 342 U.S. 868, 72 S.Ct. 108, 96 L.Ed. 652 and Sivert v. Pennsylvania R. Co., 7 Cir., 1952, 197 F.2d 371, 376. We do not read the Coray opinion as a modification of the traditional judicial function to decide whether there is a reasonable difference of opinion concerning the danger created. Cf. Tishar v. Nicodemus, D.C.Ill.1943, 49 F.Supp. 145; Fore v. Southern Ry. Co., 4 Cir., 1949, 178 F.2d 349. Restatement, Torts § 434.

In other words, the Coray opinion does not reduce the problem of proximate cause and we think it has little bearing on the problem of the effect of the language in § 51 of the Federal Employers' Liability Act with regard to the principles underlying proximate cause. See Eglsaer v. Scandrett, 7 Cir., 1945, 151 F.2d 562; Fleming v. Kellett, 10 Cir., 1948, 167 F.2d 265.

Brady v. Southern Ry. Co., supra, is our guide and the issue before us is just what danger or risk is created by a defective air brake. On almost identical facts a verdict was directed for defendant in Reetz v. Chicago & E. R. Co., 6 Cir., 1931, 46 F.2d 50. See also Lang v. New York Cent. R. R. Co., 1921, 255 U.S. 455, 41 S.Ct. 381, 65 L.Ed. 729 and St. Louis & S. F. R. R. Co. v. Conarty, 1915, 238 U.S. 243, 35 S.Ct. 785, 59 L.Ed. 1290 and McCalmont v. Pennsylvania R. Co., 6 Cir., 1922, 283 F. 736.

In the Conarty case, the absence of a coupler and drawbar resulted in the plaintiff being crushed between the switching engine on the front foot board of which he was riding and a car on a switch awaiting removal for repair. The court said, 238 U. S. at page 250, 35 S.Ct. at page 787, that the deceased " * * * who was not endeavoring to couple or uncouple the car or to handle it in any way, but was riding on the colliding engine, was not in a situation where the absence of the prescribed coupler and drawbar operated as a breach of a duty imposed for his benefit * * *." In the Lang case, the decedent brakeman, riding on a draft of cars which had been kicked toward a crippled car without a drawbar which was standing on a siding, for some reason failed to stop the draft as he was supposed to do and in the ensuing collision was crushed. Dismissal was affirmed on the Conarty precedent. These cases were explained by the Sixth Circuit in the McCalmont case, where the employee was killed when he went between two idle cars to remove the slack on a chain connecting them, and an engine unexpectedly pushed the cars together. The court read the Lang case as holding that where an unintended collision causes the injury, the defective coupler is not the proximate cause unless it was instrumental in bringing about the collision. On the basis of this distinction, we find that the Conarty and Lang decisions do not control the instant case. We are not confronted with a situation where the statutory violation aggravated the consequences of an impact. It is contended that the defective air brakes in this case were instrumental in bringing about the impact, viz., Leary's fall from the trestle.

Therefore, the only authority clearly in point is the Reetz decision, which we find unpersuasive. Defective brakes create a number of hazards, depending on the circumstances under which they operate. The danger is not confined merely to the likelihood that a sudden stop or a failure to stop might produce a collision or a severe jolt. In the instant case the danger also consists in the fact that a sudden stop in the night exposed the employees to other hazards. Among these hazards are bad weather, faulty road beds, and an unperceived trestle. There is evidence that there were many such trestles on the Boston to New York run. As stated by plaintiff-appellee in his brief, "when the air-brake-hose burst on this night, about 3:40 a. m., where it was very dark, with a ground fog, and the front of the engine was on a rather short trestle-bridge over a highway which crossed underneath, and the location of this engine on the trestle bridge was not observable by the plaintiff or any member of the train crew, it then became the duty of the train crew, and particularly the conductor, to see that this express train, and

particularly its air-brake-hose and apparatus, were repaired and placed in such condition as to continue the trip as soon as possible."

In the performance of this responsibility, Leary fell from the trestle. It seems to us that since there clearly was a breach of duty to the plaintiff Leary, then the foreseeability of the consequences of that breach should be left to the jury. "Foreseeability does not mean that the precise hazard or the exact consequences which were encountered should have been foreseen." James and Perry, Legal Cause, 60 Yale L.J. 761, 797 (1951). We cannot say that either the injury to Leary or the way it happened were consequences for which defendant should not be held liable. As the district judge pointed out: "Having procured the second hose he had two choices as to which side of the train he should use in proceeding backward with the hose. Whichever choice he took the jury might easily have thought presented elements of danger. On the one side was the track on which a train might be going in an opposite direction from the direction in which the conductor's train was going; on the other side was uncertainty, with the possibility of a bridge or a bank without a sufficient safeguard or protection. For reasons which the jury thought adequate, the plaintiff chose to go on the side on which there was no other track. As he proceeded he slipped and fell. * * * In short, it seems to me, * * * the plaintiff proved enough to permit a jury to make an in-ference that violation of the Federal Safety Appliance Act was in law the adequate cause of the damages sustained."

We do not decide that the hazards encountered by Leary in this case were within the risk created by the defective brake appliance, we only decide that it is reasonable to say that they are and, therefore, this question was properly submitted to the jury.

We perceive no merit in the appellant's contention that the jury was not adequately instructed on the law which we have discussed. We think that the charge was adequate.[4] The jury was instructed on the substance of the law and we shall not concern ourselves with the confusion of language in this area. See Atlantic Coast Line R. Co. v. Dixon, 5 Cir., 1951, 189 F.2d 525; but see Detroit City Gas Co. v. Syme, 6 Cir., 1940, 109 F.2d 366, 369.

Appellant's final contention is likewise without merit. There was no prejudicial error in refusing to allow defendant to show that plaintiff was receiving disability pension from the United States Government under the Railroad Retirement Act which should be considered in mitigation of damages.

Under § 55 of the Federal Employers' Liability Act, 45 U.S.C.A. § 55, the defendant's right of set-off for certain contributions to employee disability payments is limited to amounts paid "on account of the injury or death for which said action was

4. The charge reads in part:
"The first issue (violation of the Safety Appliance Act) having been disposed of, I now come to what is the second issue and this is a much more difficult issue. Now, if there was a failure of the company to live up to its absolute obligation with respect to the braking mechanism, was that failure—to use the statutory language—in whole or in part the cause of an accident suffered by Mr. Leary? In order to satisfy this formula —'in whole or in part'—it isn't necessary for the plaintiff to show that the cause was exclusively and immediately and directly due to some impact caused by the putting on of the brake or the failure to put on the brake. It is a question, ultimately, of fact as to whether the failure of the braking mechanism was a cause—not necessarily immediately, but a cause of the injury sustained. There must be a causal connection, however. It isn't enough that a man was on a train where the brakes were defective and he got off the train and he was injured. You must be satisfied in your own minds that there was some kind of connection of a causal nature between the failure of the brakes and the injury which occurred."

brought." [5] The Railroad Retirement Act of 1937, 45 U.S.C.A. § 228a et seq. authorizes disability payments only for employees who have reached sixty years of age or have completed thirty years of service. We think these age and service requirements for disability payments remove these payments from the coverage of § 55 of the Federal Employers' Liability Act. Accident indemnity strictly speaking does not seem to be within the Congressional intent disclosed in the Retirement Act of 1937. See Hetrick v. Reading Co., D.C.N.J.1941, 39 F.Supp. 22. Thus, this is not a set-off authorized by § 55 because we think the retirement fund is not an "insurance, relief benefit, or indemnity" within the meaning of that section. The Railroad Retirement Act is substantially a Social Security Act for employees of common carriers. The retirement fund is supported by tax collections from the employer and employee, 26 U.S.C. §§ 1500, 1520, and to a limited extent by the general public, 45 U.S.C.A. §§ 228c, 228o, 228p. The benefits received under such a system of social legislation are not directly attributable to the contributions of the employer, so they cannot be considered in mitigation of the damages caused by the employer. See McCarthy v. Palmer, 2 Cir., 1940, 113 F.2d 721, certiorari denied, 1940, 311 U.S. 680, 61 S.Ct. 50, 85 L.Ed. 438.

Thus, the appellant's argument falls under the familiar principle that payments received by a plaintiff from a collateral source are not in mitigation of damages. See Comment, 38 Mich.L.Rev. 1073 (1940). The trial judge properly excluded evidence of the appellant's contributions to the pension fund.

The judgment of the district court is affirmed.

5. 45 U.S.C.A. § 55 reads:
   "*Contract, rule, regulation, or device exempting from liability; set-off*
   "Any contract, rule, regulation, or device whatsoever, the purpose or intent of which shall be to enable any common carrier to exempt itself from any liability created by this chapter, shall to that extent be void: *Provided*, That in any action brought against any such common carrier under or by virtue of any of the provisions of this chapter, such common carrier may set off therein any sum it has contributed or paid to any insurance, relief benefit, or indemnity that may have been paid to the injured employee or the person entitled thereto on account of the injury or death for which said action was brought. Apr. 22, 1908, c. 149, § 5, 35 Stat. 66."