Bernard KRUHLINSKI, Plaintiff,

v.

NEW YORK, NEW HAVEN & HARTFORD RAILROAD COMPANY, Defendant.

United States District Court
S. D. New York.
March 22, 1963.

Joseph Friedberg, New York City, for plaintiff.

Robert M. Peet, New York City, for defendant.

McGOHEY, District Judge.

The plaintiff, a seaman, alleging that his employer, the defendant, was negligent and its vessel unseaworthy, sues for damages and for maintenance and cure. The parties waived a jury and the case was tried to the court. The findings and conclusions appear in the opinion.

The claimed injuries allegedly were sustained at about 6:30 A.M. on December 4, 1956, when the tug "Transfer 21," owned, operated and controlled by the defendant, on which the plaintiff was serving as mate, was making fast to a car float at Greenville, New Jersey. It is alleged that the master was negligent in causing the tug to move without warning Kruhlinski and that both the master and crew were incompetent, thereby rendering the tug unseaworthy.

At the time of the accident Kruhlinski, who was then sixty-one years old, had been serving on New Haven tugs for about fifteen years. The crew of which he was a member started work at midnight on December 3 at Bay Ridge, Brooklyn. At about 4:00 A.M. the tug put a full supply of oil into her fuel tanks located at the forward end of the vessel. Her draft, after taking on the oil, was 10 ft. forward, 13 ft. aft. It was not disputed that it is harder to stop and start the tug when her fuel tanks are full.

At about 6:30 A.M. the tug arrived at Greenville to deliver two car floats and pick up two others. The latter were so located that the tug could move, bow-in, between them. She did so and then came to a full stop. The deck crew then proceeded to make one float fast on her starboard side and the other on her port side. Kruhlinski, while standing on the tug's deck on the starboard side amidship, put a line onto a cleat on the car float and then made it fast to a towing bit on the tug. He then proceeded to the after end of the tug to make a line fast from her stern quarter bit, to another cleat on the float.

When a tug is made fast amidships alongside a car float there is necessarily some distance between the latter's side and the tug's stern. Here that distance was about five feet and the distance between the tug's stern quarter bit and the side of the float was about three or three and a half feet. It was Kruhlinski's intention, according to his testimony, to get up onto the float and then take a line which was to be passed to him by one of the tug's deck hands and make it fast to a cleat on the float. He stepped up on the stern quarter bit and, while attempting to climb from it to the deck of the float, he slipped and fell. The left side of his chest, three or four inches below

the armpit, struck the side of the float. He grabbed the edge of the float's deck and hung down along its side for a moment before dropping into the water. In a matter of minutes the master and two of the tug's deck hands pulled him out and brought him to the tug's galley where he was given dry clothes, coffee and aspirin. When the tug got back to Bay Ridge, he went home with his son who had been notified of the accident. Later the same morning he visited a Dr. Wiener, located near his home, who examined him, gave him "some pills," and bandaged his chest.

On December 7, 1956, Kruhlinski went to the United States Public Health Service Hospital on Staten Island, New York. An X-ray taken there disclosed no evidence of rib fracture. The "Doctor's Progress Notes" noted "Chest film essentially negative. Things fairly clear; few scattered wheezes at present. May be due to bronchitis or mild asthma. Main problem is a fall a few days ago." Kruhlinski was marked fit for duty and he worked the next day, December 8.

Kruhlinski made three visits—on December 12, 14 and 18—to Dr. Joseph Deutsch, a general practitioner and surgeon who since 1956 has examined and treated injured employees of the defendant, which pays him by the case. On the first visit Kruhlinski complained of tenderness and soreness of the chest on the left side, about the area of the ninth and tenth ribs. He made no complaints about the extremities. Dr. Deutsch found considerable tenderness but no external evidence, such as discoloration. The heart sounds were "regular" and of "fair quality." Dr. Deutsch advised treatment of "probable fracture," upon which recommendation X-rays were taken. Upon examination of the X-rays, Dr. Deutsch noted that "no abnormality can be seen."

On the two succeeding visits, Dr. Deutsch noted a lessening of hypertension and of tenderness of the chest area.

On December 26, 1956, Kruhlinski was admitted to the Public Health Service Hospital at Staten Island and remained there until his discharge on January 29, 1957. The diagnoses, and condition on discharge, were: hypertensive cardiovascular disease, stretching of ulnar nerve, and multiple contusions of chest, improved; chronic bronchitis and interstitial emphysema, due to infection, not improved; and ulcer of the stomach, healed. The record noted that Kruhlinski had had a "chronic productive cough for many years" which had "been no worse" since the accident. There was noted "some slight evidence of atrophy in the left arm" and "weakness on the left side of the body in most muscle groups * * * not pronounced or marked." Kruhlinski was marked not fit for duty.

On February 27, 1957, Kruhlinski was examined at the Public Health Service Hospital, at which time it was noted that he was "generally doing well. Chest pain only occasionally * * * Primary complaint is of weakness and numbness in left hand." He was again marked not fit for duty.

Kruhlinski was successively marked not fit for duty on March 20, April 17, May 15, May 29, June 12, July 3, July 17, July 24, August 15, August 29, and October 26, 1957.

On October 19, 1957, Kruhlinski was re-admitted to the Public Health Service Hospital and remained until December 11, 1957, when he was marked permanently not fit for duty. He was admitted because of hemoptysis (expectoration of blood). The diagnoses showed chronic bronchitis and emphysema; hypertensive and arteriosclerotic heart disease; arteriosclerosis, generalized with intermittent claudication (lameness); and brachial plexus injury. A radiographic report dated October 22, 1957, reported "No evidence of recent or active pulmonary disease. No significant change from previous chest films dating back to 11/27/56." Dyspnea (shortness of breath) "for many years" was noted. The weakness of the left arm was, "by exclusion," attributed to arthritis.

An examination on May 11, 1962, by Dr. Joseph Fisher, a specialist in internal medicine, showed a hypertensive cardiovascular disease, bronchitis, emphysema, shortness of breath, a left inguinal

hernia, and weakness of the left arm and hand.

On August 25, 1951, Kruhlinski had been admitted to the Public Health Service Hospital "complaining of weakness and weight loss." He had had a mild stroke the year before, and the hospital record indicates that "for about a year" he had "had a constant tingling of the fourth and fifth fingers bilaterally." The diagnoses upon discharge, on September 18, 1951, were cerebral arteriosclerosis; cerebral thrombosis due to arteriosclerosis; osteoarthritis; chronic bronchitis, and obstructive emphysema. He was marked "fit for light duty." The record upon this admission also noted a left inguinal hernia, and a "sense of numbness along ulnar part of hand."

Kruhlinski was admitted again to the Public Health Service Hospital on May 24, 1954, and January 13, 1956. The bronchitis, emphysema, and weakness of the left hand and side, among other things, were noted on each of these occasions. He was also admitted to the Lincoln Hospital in New York for two weeks in October 1954 for pharyngeal varices, following a coughing of blood.

■ Dr. Eglee was called as an expert by the defendant. He had not examined the plaintiff, but he had reviewed all of the hospital records pertaining to his various treatments. Dr. Eglee has had a distinguished career of almost forty years as a specialist in diseases of the chest. Dr. Fisher was called as an expert by the plaintiff. He had examined Kruhlinski only once, shortly before he testified. On the testimony of Dr. Eglee, whose opinion I accept in preference to that of Dr. Fisher, I find that Kruhlinski's fall on December 4, 1956, resulted only in multiple contusions of the chest; and that it neither caused nor aggravated his pre-existing bronchitis, emphysema, or cardiovascular disease. The stretching of the ulnar nerve I find to have been caused by osteoarthritis which was neither caused nor aggravated by the accident.

■ Kruhlinski contends he was caused to fall because the tug suddenly "backed away" or "pulled away" just as he started to jump up from the top of the stern quarter bit over to the car float. In support of this contention he said he heard the men on the tug shout to the master, who was then in the wheelhouse, to stop the engines. This is rejected on the testimony of Stephens, the deck hand, which I accept. He said he shouted to the master, but only to warn him not to start the engines because there was a man overboard. He and Olsen, another deck hand, also said that when they looked over the side to locate Kruhlinski, they saw no "quick water," a condition which would have existed if the propeller was moving. These men helped Mullally, the master, to pull Kruhlinski from the water. They manifested no hostility to Kruhlinski. As far as appears, they had no motive to lie and it is not contended they did. I accept their testimony. The master also testified that the engines were not operating at the time. He, of course, had an interest to protect his professional reputation. I find, however, from my observation of him while on the stand that he did not let his interest color his testimony. I accept it.

Accordingly, I find that when Kruhlinski fell the tug was at a dead stop, that her propeller was not moving, that she did not "back" or "pull" away from the side of the float.

■ Kruhlinski testified that the top of the stern quarter bit was wet from the early morning mist but that just before stepping up onto it he wiped it off. I do not credit the latter part of this testimony. He conceded that there was available to him a safe way of getting onto the float from the tug's deck amidship. There, quite easily, he could have stepped from a firm footing on the tug to the float without the need to jump across open water. He was under no compulsion to proceed as he did. He made a free choice of means to get onto the float. There is no claim, and certainly there was no evidence, that the

master, his only superior on the tug, ordered Kruhlinski to adopt the procedure he followed. Kruhlinski was the mate and a man of fifteen years' experience on railroad tugs. There is not a shred of evidence that, in any respect which might have contributed in any degree to Kruhlinski's accident and injury,[1] the master or any member of the crew was either negligent or unequal in seamanship to the ordinary tug master or deck hand.[2] I find they were not. The defendant did not breach its duty to use reasonable care to furnish Kruhlinski a reasonably safe place to work. Neither did it breach its warranty of the seaworthiness of the master and crew.

■ I find that the accident and any injury to Kruhlinski resulting therefrom was caused solely by Kruhlinski's own negligence.

■ Accordingly, the plaintiff's claim for damages is dismissed.

Kruhlinski's claim for maintenance and cure remains to be considered. The defendant concedes that Kruhlinski was a "seaman" at the time he was injured and that his injury occurred during his service on the defendant's vessel. The defendant further concedes that following the accident Kruhlinski was ill, unfit for duty and under care as an "outpatient" for a total of 282 days; and that $7 per day is the appropriate rate to be paid to a seaman entitled to maintenance.

■ It contends, however, that Kruhlinski is not so entitled. In support of this contention the defendant does not rely on any of the grounds rejected by the Court of Appeals for this circuit in Weiss v. Central R. R.[3] but on one which seems never to have been suggested before. In July 1946 Congress amended the Railroad Unemployment Insurance Act (the Act) by authorizing payment to be made to railroad employees for days of unemployment resulting from sickness.[4] It is conceded that Kruhlinski applied for and received such benefits totaling $1,587.56. The defendant argues that Congress intended the statutory sickness benefits to be, for seamen employed by railroads, a substitute for the maintenance payments to which seamen who become sick or disabled in the ship's service are entitled under general maritime law.[5]

Concededly there is nothing in the language of the 1946 amendment or in its legislative history to suggest that Congress intended any such result. Nor is it likely that, if its attention had been focused on the point, Congress, in legislating to guarantee "a minimum degree of protection"[6] to railroad employees out of work due to illness, would have reduced the greater protection already provided by the general maritime law for those of them who are seamen. Unlike "maintenance," the amount of available statutory sickness benefits varies according to the wages of the recipient;[7] and no benefits are payable after the prescribed maximum period[8] regardless of

---

1. Rogers v. Missouri Pacific R. Co., 352 U.S. 500, 77 S.Ct. 443, 1 L.Ed.2d 493.

2. Keen v. Overseas Tankship Corp., 2 Cir., 194 F.2d 515, cert. denied, 343 U.S. 966, 72 S.Ct. 1061, 96 L.Ed. 1363; Pinto v. States Marine Corp., 2 Cir., 296 F.2d 1, cert. denied, 369 U.S. 843, 82 S.Ct. 874, 7 L.Ed.2d 847; Ezekiel v. Volusia Steamship Co., 2 Cir., 297 F.2d 215, cert. denied, 369 U.S. 843, 82 S.Ct. 874, 7 L. Ed.2d 846.

3. 2 Cir., 235 F.2d 309.

4. 45 U.S.C. § 352(a) (ii).

5. The argument was presented in terms of a displacement of the remedy of "maintenance and cure." But all that is involved in this case is a recovery for maintenance, i. e., the "living allowance sufficient to enable the seaman to maintain himself in a manner comparable to that which he received aboard ship." Bartholomew v. Universe Tankships, Inc., 2 Cir., 279 F.2d 911, 914.

6. S.Rep. No. 1710, 79th Cong., 2d Sess. 5 (1946), 1946 U.S. Code Cong.Serv. pp. 1316, 1320.

7. 45 U.S.C. § 352(a).

8. 45 U.S.C. § 352(c).

whether maximum cure has been then achieved. Furthermore, while "maintenance" is designed to provide assistance contemporaneously with the need,[9] the period for which statutory sickness benefits may be paid does not commence until from four to seven days after the applicant for them registers with the Railroad Retirement Board (the Board)[10] which administers the Act. And even after registration, compliance with the administrative procedures necessarily delays for a further period the actual receipt of the benefits.[11] Absent a clear and unmistakable expression, Congress will not be deemed to have intended a so radical curtailment of the seaman's traditional right to "maintenance."

 Alternatively, the defendant urges that it should be allowed to set off against Kruhlinski's recovery, the amount of statutory sickness benefits he received. Pointing out that the Railroad Unemployment Insurance Account from which such benefits are paid is financed largely by employer contributions,[12] the defendant argues that it could not have been Congress' intent that the employer be required to pay twice, or that the plaintiff be allowed to recover twice, for the same infirmity.

Initially it must be noted that allowance of a set-off in cases such as this could frustrate the basic policy of providing for seamen concurrently with their need, as effectively as complete abrogation of the right to maintenance, for it would furnish the vessel owner an incentive to delay the payment of maintenance until the seaman had first exhausted his rights to the statutory benefits.[13] That result surely was not intended by Congress.

It is indeed clear that Congress did not intend there should be double recovery in cases such as this. But it is equally clear that it did not choose to prevent such a result by allowing the railroad to set off against his claim, the amount of benefits received by the plaintiff. On the contrary, Congress provided that *"The Board shall be entitled to reimbursement from any sum or damages paid or payable to such employee or other person through suit, compromise, settlement, judgment, or otherwise on account of any liability (other than a liability under a health, sickness, accident, or similar insurance policy) based upon such infirmity, to the extent that it will have paid or will pay benefits for days of sickness resulting from such infirmity."*[14] (emphasis supplied)

It was not shown whether the Board has asserted a lien against Kruhlinski's recovery but there is no reason to assume that it has failed, or will, to carry out the congressional purpose. The presumption is that it will obey the law. Kruhlinski, accordingly, will have to repay to the Board the statutory sick benefits he received amounting to $1,587.56.

 Denial of set-off does not, as counsel urges, compel "dual payments by the railroad for the same purpose." Its obligation to pay maintenance is imposed by the general maritime law and inures to the benefit of a limited class of its own employees, namely, those who are seamen and who fall ill while in the service of its vessels. Its obligation to pay contributions to the railroad unemployment insurance account is imposed by a statute enacted, as part of a nation-wide social security system, in order to provide relief for all workers on all railroads in the United States who are laid off for lack of work or who are unable to work because of illness, regardless of whether

---

9. See Vaughan v. Atkinson, 369 U.S. 527, 537–538, 82 S.Ct. 997, 8 L.Ed.2d 88 (dissenting opinion); Gypsum Carrier, Inc. v. Handelsman, 9 Cir., 307 F.2d 525, 535; 1 Norris, The Law of Seamen 653 (2d ed. 1962).

10. 45 U.S.C. § 352(a).

11. 20 C.F.R. §§ 335.102–105.

12. 45 U.S.C. § 358 and § 360. There are no employee contributions to the fund.

13. See Gypsum Carrier, Inc. v. Handelsman, supra, 307 F.2d at 536.

14. 45 U.S.C. § 362(o).

or not their incapacity occurs while they are in service.[15]

The plaintiff is entitled to be paid maintenance in the amount of $1,974.

Judgment may be entered in accordance with the opinion.

15. Cf. New York, New Haven & Hartford R. Co. v. Leary, 1 Cir., 204 F.2d 461, 467–468.