William O. **HAUGHTON**

v.

**BLACKSHIPS, INC.**

**Civ. A. No. 69–C–161.**

United States District Court,
S. D. Texas,
Corpus Christi Division.

April 30, 1971.

Supplemental Order June 16, 1971.

David Yancey White, Corpus Christi, Tex., for plaintiff.

R. W. Woolsey, Corpus Christi, Tex., for defendant.

## MEMORANDUM

OWEN D. COX, District Judge.

Plaintiff, William O. Haughton, at the time of his injury, was the bos'n (boat-swain) on the vessel "THE PANTH-ER," an oil tanker owned by Defendant Blackships, Inc. This vessel was at the dock in Philadelphia, Pennsylvania, on the morning of February 17, 1967. Aft-er instructions from the chief mate, the Plaintiff and two other seamen loaded two new coils of mooring line. Under the direction of the Plaintiff, these coils were placed on the deck on the starboard side of the vessel in a corner by the shelter deck. After the coils of line had been secured, at least the Plaintiff thought so, the first mate directed him to move the mooring line to the forepeak of the vessel.

The Plaintiff testified that he com-plained to the first mate about moving the line because there was snow and ice on the deck and the condition was haz-ardous. The first mate told him it was the captain's orders. Plaintiff made no further objection, nor did he suggest any precautionary measures, but went ahead with the work.

The two coils of line, one at a time, were "flaked" out on the afterdeck, that is, rolled down the deck and back again several times so that the mooring line was completely uncoiled. When the first coil was "flaked" out, a hoisting line (gantline) was connected to one end of it and, by action of a winch near the fore-peak, pulled the mooring line through the shelter deck (a part of the mid-house) to the foredeck of the vessel, and placed in a cargo hold. The second coil was handled in the same way.

After the first coil was "flaked" out, the Plaintiff walked up to the forepeak of the vessel and supervised the final loading of the mooring lines. During this procedure, which obviously required the bos'n and the two seamen helping him to walk in the snow on the deck, no one fell. After the mooring line was fi-nally stored, there was nothing else to be done by the bos'n and the crew. The job for the morning had been completed without mishap.

In returning to the mid-house, Plain-tiff took a different route than he had previously used and walked from the winch back toward the shelter deck on the port side of the vessel. Just before

he got where he was going, he fell and, as the testimony indicates, he hurt his back and neck. He reported the fall and stayed in his bunk for a day or so. Then, he went back to work. Plaintiff did, shortly after the accident, see a doctor in Fort Lauderdale, Florida, and was given some pills for pain, but continued to work for about a year and a half before seriously attempting to obtain medical attention.

There is no dispute that Plaintiff fell and was injured. But, whether he or the Defendant, or both, must bear the responsibility for the fall is in question, as well as whether or not his actions, or his failure to act, after the accident and the receipt of his National Maritime Union pension, might limit, to some extent, Plaintiff's right to or the amount of his recovery.

 The evidence established there was snow on the deck. The snow had not been there the night before but it was there when the bos'n and his crew of two other seamen commenced loading the coils of new mooring line. There is a conflict in the Plaintiff's testimony as to how deep the snow was. However, apparently the deck was covered. The testimony as to an icy condition was not convincing, but snow can be slippery. The Court is of the opinion that the condition of the deck was such that, under Mitchell v. Trawler Racer, Inc., 362 U.S. 539, 80 S.Ct. 926, 4 L.Ed.2d 941 (1960), the vessel was not seaworthy and this Court so finds. The question of whether the Defendant was negligent in not requiring the deck to be cleaned of snow and ice seems unimportant at this point.

Plaintiff, being fully aware of the condition on the deck, had complained about it being hazardous, but took no precautionary measures, except, as Plaintiff testified, to work more slowly. After the work was finished, Plaintiff started back to the mid-house over a route on the deck which he had not traversed before. He said he did this because the area where he and his crew had been working had become slushy, which implies melting snow. This, when taken with the fact that it had just recently snowed, indicates to the Court the snow was not deep and there was not an icy condition. There is no testimony that Plaintiff made any particular effort to be careful in the manner in which he walked on his way to the mid-house and it is difficult for the Court to accept any premise which assumes Plaintiff, who was an experienced bos'n, could not have walked, by being careful, back to the mid-house without mishap.

 Under such facts, and the direction of Symonette Shipyards, Ltd., v. Clark, 365 F.2d 464 (5 Cir., 1966) and McBride v. Loffland Brothers Company, 422 F.2d 363 (5 Cir., 1970), the Court finds that Plaintiff was at fault and his fault contributed fifty percent (50%) to the fall and the injuries he received.

 Plaintiff, as a result of his fall, suffered injury to the C–5–6 cervical (neck) intervertebral disk. Defendant contends that Plaintiff's failure to submit to a spinal graft and fusion prevents Plaintiff's recovery of any damages which such operation would have alleviated. The case of Murphy v. American Barge Line, 169 F.2d 61 (3 Cir., 1948), says the authorities are uniform that, except in grave and severe operations, the injured party must follow the recommendation of an expert. However, in the case of Cline v. United States, 270 F.Supp. 247 (S.D.Fla., 1967), the Court required the operation, but only after concluding "that a reasonably prudent person acting under the facts and circumstances which were developed by the trial of this case would submit to the operation which has been prescribed." The Texas case of Thompson v. Quarles, Tex.Civ.App., 297 S.W.2d 321, err ref'd, applies the same rule. This Court proposes to follow *Cline* and *Thompson* and there being no jury, decide the matter by a finding of fact.

Dr. Jackson Upshaw, a medical doctor who has specialized in orthopedic surgery for over twenty years, testified regarding his examination of Plaintiff on

April 19, 1969. His findings were compatible with the C–5–6 cervical intervertebral disk degeneration, and, based on the history given him, Dr. Upshaw attributed that injury to the fall which the Plaintiff received on the 17th of February, 1967.

Dr. Upshaw testified by deposition that in his opinion, based upon reasonable medical probability, that surgical intervention was necessary for relief of Plaintiff's pain and discomfort, and that Plaintiff would probably have the operation if he hurt bad enough. Dr. Upshaw testified that there is a certain inherent risk in any surgery, but that in this particular case, the operation would be an acceptable risk; but, that, in his opinion, Plaintiff would get relief from pain and suffering if he had the surgery, would have very good recovery and would be able to do the same kind of work he had been doing up to the time he got hurt.

Dr. Ray, as a general practitioner, who had referred Plaintiff to Dr. Upshaw, was considerably more cautious about the operation, although he, too, said having such an operation would depend on how bad the Plaintiff was hurting.

This Court feels that the evidence presented by the orthopedic specialist should be given more weight than that of the general practitioner; but even so, when you consider the age of Plaintiff, who was about fifty-one (51) years of age at the time of injury, apparently fifty-four (54) at the time of trial, and that he is able to work at less strenuous jobs and does not hurt bad enough to have the surgery, the Court feels that a reasonably prudent man, under the circumstances in this case, would not go ahead with the surgery, and the Court so finds.

Before proceeding to discuss the amount of damages Plaintiff is entitled to receive by virtue of his injury, the Court needs to consider whether or not Plaintiff's National Maritime Union pension should be taken into account in determining damages. The Plaintiff cites Page v. St. Louis Southwestern Ry. Co. (5 Cir.), 349 F.2d 820 (1965), as authority to exclude it from consideration as collateral-source evidence. This case cites Tipton v. Socony-Mobil Oil Company, 375 U.S. 34, 84 S.Ct. 1, 11 L.Ed.2d 4 (Jones Act case) and Eichel v. New York Central, 375 U.S. 253, 84 S.Ct. 316, 11 L.Ed.2d 307 (FELA case), in which Petitioner was already receiving benefits under the Railroad Retirement Act. These cases indicate there is a policy against the use of collateral-source evidence in Federal Employers Liability Act cases and Jones Act-maritime law seamen's cases, unless the benefits, which constitute the collateral-source evidence, are from a fund or funds directly attributable to the employer. In the Tipton case the collateral-source evidence was directed at Petitioner's status as a seaman and not to damages. The Supreme Court in the Eichel case cites New York, New Haven & Hartford Ry. Co. v. Leary, 1 Cir., 204 F.2d 461, 468, (cert. den.) in which the Court of Appeals said that the Railroad Retirement Act is substantially a Social Security Act and the benefits received under it are "not directly attributable to the contributions of the employer" and, thus, cannot be considered in mitigation of the damages caused by the employer. The fund out of which railroad retirement benefits are paid is made up of money from the employer, and the employee, and, since it exists by virtue of a Federal Statute, the public has some stake in it.

All of the retirement benefits presently being received by the Plaintiff Haughton are from a fund established by virtue of a contract between the Employer and the National Maritime Union, and all of the money in the fund was contributed by his employer; so, although having no clear definition of the term, this Court is of the opinion Plaintiff's pension is "directly attributable" to his employer. The fact that prior to 1957 Plaintiff may have worked for other employers who may have made contri-

butions for his benefit, does not appear of consequence to the Court. So, the Court holds that the collateral-source income which the Plaintiff is presently receiving is to be considered by this Court in mitigation of damages.

The determination of the amount of damages suffered by any Plaintiff as a result of an injury is most difficult for this Court. How much more the Plaintiff could have done and earned than he did after the injury but before the lawsuit, and how much more work he will do, and how much more he will earn after the conclusion of the lawsuit, are questions which must be answered in spite of the uncertainty involved. Probable future increases in pay and overtime are also to be considered. The severity of the pain already suffered and how severe any future pain may be is not something that can definitely be determined.

The Court, in attempting to fairly appraise the testimony related to these questions, must necessarily take into account his impressions of the witnesses who have testified. The arguments of Counsel is almost always helpful, but their respective views are necessarily divergent.

The Court is satisfied that the Plaintiff has pain caused by the cervical intervertebral disk degeneration resulting, in considerable part, from Plaintiff's injury on February 17, 1967. What disability Plaintiff has is primarily caused by the pain presently being suffered; but, he is not totally disabled. He will have pain and some loss of earnings in the future.

After taking into account mitigating circumstances, the Court finds that Plaintiff's damages, past and future, are in the amount of Thirty-four Thousand Six Hundred Fifty Dollars ($34,650.00), and since Plaintiff was at fault to the extent of fifty percent (50%), he is entitled to a judgment only in the sum of Seventeen Thousand Three Hundred Twenty-five Dollars ($17,325.-00).

The final matter with which the Court is concerned in this case is maintenance and cure. The stipulations of the parties provide that, under the National Maritime Union contract with Defendant, maintenance is fixed at Eight Dollars ($8.00) per day. The medical testimony clearly supports a finding that, without surgery, the Plaintiff's condition would not improve subsequent to his first visit to Dr. Upshaw in April, 1969. Dr. Upshaw's findings on Plaintiff's last visit on January 17, 1971, were that Plaintiff's condition was about the same, maybe a little bit worse, than at the time of the first visit. There is no evidence that Plaintiff went to see Dr. Upshaw or that any medical expenses were incurred by Plaintiff between his first visit and his last visit. The Court is of the opinion that the Plaintiff is not entitled to recover for maintenance and cure beyond April 19, 1969. Farrell v. United States, 336 U.S. 511, 69 S.Ct. 707, 93 L.Ed. 850. Plaintiff is entitled to judgment for maintenance and cure in the amount of One Thousand Dollars ($1,000.00).

This memorandum and Order shall constitute the Court's findings of fact and conclusions of law, and Plaintiff's attorney shall prepare a final judgment in accordance herewith. The Clerk shall notify Counsel.

SUPPLEMENTAL MEMORANDUM AND ORDER

This Court, having considered the request of Plaintiff herein to specify the amounts of money awarded for the proper elements of damages in lieu of the lump-sum award previously made, is of the opinion, in line with Neill v. Diamond M. Drilling Company (5 Cir.), 426 F.2d 487 (1970), and Noble v. Bank

Line, Ltd., (5 Cir.), 431 F.2d 521 (1970), that the request is well taken; and, this Court does hereby supplement its memorandum signed the 30th day of April, 1971, for the purpose of showing what portion of the total damages of $34,650.00 is allocated to the following elements of damages, and none other, as follows:

(a) The reasonable value of the loss of earnings of Plaintiff from the date of the accident to the time of trial, and the reasonable value of his loss of capacity to work and earn money in the future, in the amount of $22,900.-00; less the Plaintiff's maritime pension to the extent of $3,500.00 in mitigation of damages, leaving damages for the elements set forth in this paragraph in the amount of $19,400.00;

(b) Physical pain and mental anguish suffered by Plaintiff from the date of the accident to the time of trial, and the reasonable value of the physical pain and mental anguish that Plaintiff in reasonable probability will suffer in the future as a proximate result of the accident, in the amount of $15,000.00;

(c) Since Plaintiff is not disposed to have an operation, the amount as will reasonably compensate him for such medical services and expenses that he may in reasonable probability have to undergo in the future, $250.-00.

Otherwise, said original memorandum signed the 30th day of April, 1971, is not altered, changed or supplemented, but, in all respects, stands as the order of this Court; and, as therein provided, since Plaintiff was at fault to the extent of fifty percent (50%), he is entitled to a judgment for the various elements of damages only in the sum of Seventeen Thousand Three Hundred Twenty-five Dollars ($17,325.00). Plaintiff's attorney shall prepare a final judgment in accordance with the original memorandum and this supplement, to be approved as to form by opposing counsel, and presented to the Court forthwith.