Patricia Lee SZEDLOCK, Plaintiff,

v.

George TENET, Director of Central Intelligence Agency, Defendant.

No. CivA 00–991–A.

United States District Court,
E.D. Virginia,
Alexandria Division.

April 11, 2001.

Claude David Convisser, Claude D. Convisser & Associates, P.C., Alexandria, VA, David Gabriel Bookbinder, American Canoe Association Inc., Springfield, VA, for plaintiff.

Dennis E. Szybala, U.S. Attorney's Office, Alexandria, VA, for defendant.

## MEMORANDUM OPINION

ELLIS, District Judge.

This is an action brought by a hearing-impaired former employee of the Central Intelligence Agency ("CIA" or "Agency") alleging that the CIA[1] violated the Rehabilitation Act, 29 U.S.C. § 701 *et seq.*, by failing to provide her with "reasonable accommodations" in light of her disability. Following a three-day jury trial and a verdict awarding plaintiff $25,000 in compensatory damages, two matters remain for consideration: (i) defendant's renewed motion for judgment as a matter of law pursuant to Rule 50, Fed.R.Civ.P., and (ii) plaintiff's request for equitable relief in the form of back pay and front pay.

### I.

Plaintiff suffers from a congenital, sensorineural hearing loss in both of her ears. To cope with her hearing loss, plaintiff has used hearing aids since the age of five. Between 1989 and 1998, plaintiff, as a CIA employee, held seven different positions, including engineering positions, supervisory positions, and a stint as a full-time

---

1. George Tenet, in his official capacity, is the proper defendant in this action brought pursuant to the Rehabilitation Act. Nonetheless, for clarity, defendant is referred to throughout as the "CIA."

student at Johns Hopkins University to obtain a masters degree.[2] In each position, plaintiff's severe hearing loss[3] made it difficult for her to participate in multi-party meetings, which accounted for a large portion of plaintiff's typical work day. To address the effects of her hearing loss, plaintiff, throughout her nine-year career, was persistent and consistent in repeatedly requesting that an oral interpreter or a note-taker be provided to assist her in multi-party meetings.[4] The overwhelming majority of these requests for accommodations were denied.[5] Following a determination by the CIA's Office of Medical Services that plaintiff was unable to perform the essential functions of her position

or any other equivalent position within the Agency with or without reasonable accommodations, plaintiff, in 1998, sought and received a Medical Disability Retirement ("MDR"). Thereafter, plaintiff exhausted her administrative remedies, and on June 13, 2000, she filed the instant action alleging that throughout her employment defendant had failed to provide her with reasonable accommodations for her disability. The parties filed cross-motions for summary judgment. Plaintiff's partial motion for summary judgment was denied, while defendant's motion for summary judgment was granted in part and denied in part. *See Szedlock v. Tenet*, C.A. No. 00–991–A (E.D.Va. Mar.6, 2001).[6] There-

**2.** From October 1989 to March 1991, plaintiff was a systems engineer on a computer upgrade project ("Position 1"). From March 1991 to December 1992, plaintiff served as a systems engineer on a telecommunications project ("Project 2"). From December 1992 to June 1994, plaintiff was a technical investment analyst ("Position 3"). From July 1994 to September 1995, plaintiff held an engineering position ("Position 4"). From September 1995 to September 1996, plaintiff was a full-time student in a masters program at Johns Hopkins University ("Position 5"). From September 1996 to October 1997, plaintiff was a branch chief for the Office of Technical Collections ("Position 6"). Plaintiff was thereafter assigned to Position 7, which she held from October 1997 to August 1998, when she was granted the MDR. Although nominally a Senior Systems Engineer, throughout Position 7, plaintiff was assigned no responsibilities and spent her time working on her disability application and Equal Employment Opportunity ("EEO") claim.

**3.** The record reflects that when plaintiff began her employment at the CIA, plaintiff had a speech discrimination level of 26% bilaterally and usable hearing in the low frequencies but no hearing in the high frequencies. Currently, plaintiff has a zero speech discrimination level and no usable hearing in either low or high frequencies.

**4.** A variety of accommodations are available to aid deaf and hard-of-hearing employees in their work. A "sign language interpreter" is

fluent in either American Sign Language or Pigeon Sign English and uses his or her hands to translate speech for a hearing-impaired client. An "oral interpreter" mouths the words of a speaker so that the hearing-impaired client is able to read the interpreter's lips, rather than the lips of a speaker, which, for a variety of reasons, might be difficult to read. Furthermore, the hearing-impaired client does not have to search for the speaker, but instead can focus directly on the interpreter. A "computer assisted note-taker" functions much like a court reporter. As the note-taker types, the text appears on a screen in front of the hearing-impaired client. Some note-takers provide word-for-word transcription while others provide more of a general summary.

**5.** *See infra* Part II.

**6.** Defendant's motion for summary judgment was granted in two respects: (i) the applicable statute of limitations barred the imposition of liability for all events that occurred before September 30, 1996, *see* 29 C.F.R. § 1614.105(a)(1); *Zografov v.. V.A. Medical Ctr.*, 779 F.2d 967, 968–70 (4th Cir.1985), and (ii) plaintiff's claims for hearing loss and related medical expenses were barred by the Federal Employees Compensation Act, 5 U.S.C. § 8116(c), *see McDaniel v. United States*, 970 F.2d 194, 197 (6th Cir.1992).

after, a jury trial was held. The jury returned a verdict in favor of plaintiff, finding specifically (i) that plaintiff, with or without reasonable accommodation, could perform the essential functions of her position, (ii) that defendant failed to provide the requisite reasonable accommodation, (iii) that defendant did not in good faith attempt to do so, and (iv) that, as a result, plaintiff was entitled to $25,000 in compensatory damages.[7]

## II.

Following the close of plaintiff's evidence in her case-in-chief, and again at the close of all the evidence, defendant moved for judgment as a matter of law pursuant to Rule 50(a), Fed.R.Civ.P. Both motions were denied. Thereafter, following return of the jury verdict, defendant renewed its motion under Rule 50(b) for judgment as a matter of law on the ground that the evidence at trial is legally insufficient to support the jury's finding that defendant had not made a "good faith effort" to provide reasonable accommodations to plaintiff's

disability. This motion has been fully briefed and is now ripe for disposition.

■■■■■ A jury verdict should be accorded the "utmost respect." But if "there is no legally sufficient evidentiary basis" for the verdict, a motion for judgment as a matter of law must be granted. *Price v. City of Charlotte*, 93 F.3d 1241, 1250 (4th Cir.1996); *see Wilhelm v. Blue Bell, Inc.*, 773 F.2d 1429, 1433 (4th Cir.1985). In assessing whether this standard has been met, a "[c]ourt should not attempt to substitute its judgment for the jury," weigh the evidence, or pass on the credibility of witnesses. *Jacobs v. College of William & Mary*, 517 F.Supp. 791, 794 (E.D.Va.1980), *aff'd*, 661 F.2d 922 (4th Cir.1981). Instead, the evidence must be construed in the light most favorable to the party against whom the motion is made, giving that party the benefit of all inferences. *See Lack v. Wal Mart Stores, Inc.*, 240 F.3d 255, 259 (4th Cir.2001); *Duke v. Uniroyal, Inc.*, 928 F.2d 1413, 1417 (4th Cir.1991). With the evidence so construed, judgment as a matter of law pursuant to Rule 50 may be

7. The verdict form, as compiled by the jury, is as follows:

    1. Has plaintiff proved, by a preponderance of the evidence, that she can perform the essential functions of the employment position she held with or without a reasonable accommodation?

          X

Yes

 

No

(If you answer "yes" to question # 1, proceed to question # 2. If you answer "no" to question # 1, no further questions need to be answered.)

    2. Has plaintiff proved, by a preponderance of the evidence, that defendant did not provide her with a reasonable accommodation that would enable her to perform the essential functions of the employment position she held between September 30, 1996 and October 13, 1997?

          X

Yes

 

No

(If you answer "yes" to question # 2, proceed to question # 3. If you answer "no" to question # 2, no further questions need to be answered.)

    3. Has defendant proved, by a preponderance of the evidence, that it, in good faith, attempted to provide plaintiff with a reasonable accommodation between September 30, 1996 and October 13, 1997?

 

Yes

          X

No

(If you answer "no" to question # 3, proceed to question # 4. If you answer "yes" to question # 3, no further questions need to be answered.)

    4. What amount of compensatory damages, if any, has plaintiff proved by a preponderance of the evidence were caused by defendant's failure to provide plaintiff with a reasonable accommodation? $25,000

granted only if a reasonable jury, on that evidence, could reach only one result. Put in the context of this case, judgment as a matter of law on the good-faith defense may be granted only if the evidence, construed in plaintiff's favor, precludes a finding that defendant acted in good faith. *See Price,* 93 F.3d at 1250.

Defendant contends that it is entitled to judgment as a matter of law because it made good faith efforts to provide reasonable accommodations for plaintiff's disability, and under 42 U.S.C. § 1981a, a plaintiff, in such circumstances, is not entitled to recover compensatory damages.[8] In support of its motion, defendant identifies eight distinct instances in which it provided, or attempted to provide, plaintiff with a reasonable accommodation. These instances, defendant argues, confirm that it sought in good faith to accommodate plaintiff's disability. Specifically, these instances are as follows: (1) Patricia W. and William D.,[9] plaintiff's supervisors in Position 6, sought to accommodate plaintiff's inability to participate fully in multi-party meetings by managing or interrupting discussions to ensure that only one person spoke at a time; (ii) because air travel posed problems for plaintiff, she was not required to travel by airplane; (iii) defendant installed high-intensity projectors in two conference rooms so that the lights could remain on while slides were shown, thereby aiding plaintiff who was unable to read the lips of the speaker when the lights were dimmed to use an overhead projector during multi-party meetings; (iv) defendant published a vacancy notice for a part-time note-taker position to assist plaintiff in multi-party meetings and elsewhere; (v) Patricia W. attempted to convert the part-time note-taker position into a full-time position; (vi) Patricia W. contacted the Virginia state agency for the deaf and hard-of-hearing to locate either a note-taker or an oral interpreter; (vii) Lynnea G., the Program Manager of the CIA's EEO for the Deaf and People with Disabilities, attempted to recruit interpreters; and (viii) defendant permitted Nancy K. to provide oral interpreting services for plaintiff twice during position six and several times, including a six month period, prior to Position 6.

To be sure, this evidence would allow a reasonable jury to find that defendant attempted in good faith to provide accommodations for plaintiff's disability. Yet, this does not end the analysis, for there is also ample record evidence to support a finding that defendant did not act in good faith. This is so because "[t]he very evidence that suggests that the company did not reasonably accommodate [plaintiff] is also probative of a lack of good faith." *Howell v. Michelin Tire Corp.,* 860 F.Supp. 1488, 1494 (M.D.Ala.1994). During plaintiff's tenure in Position 6 (September 30, 1996 to October 13, 1997), plaintiff made approximately 130 requests for either an oral interpreter or a note-taker,[10] of which only

---

8. 42 U.S.C. § 1981a provides, in pertinent part, that

> [i]n cases where a discriminatory practice involves the provision of a reasonable accommodation ..., damages may not be awarded ... where the [employer] demonstrates good faith efforts, in consultation with the person with the disability who has informed the [employer] that accommodation is needed, to identify and make a reasonable accommodation that would provide such individual with an equally effective

opportunity and would not cause an undue hardship on the operation of the business.

9. To protect the confidentiality of CIA employees, only the first name and the initial of an employee's last name are used.

10. The requests for an oral interpreter were often made as a request for a sign interpreter who could mouth the words, thus performing the function of an oral interpreter. *See supra* note 4.

eight percent were met. Specifically, (i) on two or three occasions, defendant provided a sign interpreter—Nancy K.—who mouthed the words of speakers in meetings, and (ii) on eight occasions, defendant provided a note-taker or court reporter who transcribed speakers' words during meetings.[11] These limited efforts to accommodate the plaintiff stand in sharp contrast to efforts made to accommodate other hearing-impaired employees. Significantly, the record reflects that defendant filled approximately sixty to ninety percent of the requests for accommodations made by other deaf and hearing-impaired employees at the CIA. Moreover, until the fall of 1997, defendant provided at least five hard-of-hearing employees with dedicated interpreters. Yet, defendant offered no explanation why plaintiff was not provided with the accommodations other employees received.[12] Based on the disparity in the rates in fulfilling accommodation requests, a reasonable jury could have concluded that defendant's attempts to accommodate plaintiff were not in good faith.

Moreover, a reasonable jury could reach a similar conclusion concerning defendant's attempt to hire a part-time note-taker. Significantly, defendant published a vacancy notice for a part-time, GS–10 level position. Yet, the record reflects that other interpreters employed by the CIA were full-time, GS–12 level employees. Furthermore, defendant limited its search for a note-taker to employees within the CIA. Given this, a reasonable jury could conclude that the effort to hire a note-taker

was not in good faith because the limitations defendant imposed made it unlikely that any CIA employee would be interested in the position. Nor is a different conclusion required in light of Patricia W.'s efforts to convert the position from part-time to full-time. This is so because it is the good faith of the CIA, not of Patricia W., that is relevant here. Accordingly, the appropriate inquiry is the CIA's refusal to seek a full-time position, rather than Patricia W.'s contrary effort. In this regard, a reasonable jury could conclude that defendant's efforts, as a whole, were both insufficient and not in good faith. Moreover, despite the efforts of Lynnea G. and Patricia W. to locate interpreters to work at the CIA, the record supports a finding that defendant's efforts were not in good faith, because defendant did not pursue available alternatives to locating a trained interpreter or note-taker for the plaintiff. For example, as the record reflected, defendant might have enlisted the services of any competent secretary, who could have used the computer assisted note-taking system to assist plaintiff. Furthermore, Dr. Rosenstein testified that a person could be trained within one week to two months to provide adequate oral interpreting services to the plaintiff. Defendant pursued neither of these options; its failure to do so could be found by a reasonable jury to be evidence of defendant's lack of good faith in the accommodation effort.

In sum, evidence that defendant made some efforts to accommodate plaintiff does not impair a legally sufficient evidentiary

---

11.  With the exception of a six month period while plaintiff was in Position 3, December 1992 to June 1994, this accommodation percentage was consistent throughout plaintiff's tenure with the CIA.

12.  Defendant argued that it did not provide accommodations to plaintiff in the same percentage as it did to other employees because the CIA did not employ any oral interpret-

ers—the primary accommodation plaintiff requested. Yet, a reasonable jury could have found this argument unpersuasive, as plaintiff consistently requested an · oral interpreter with sign support, that is, a sign interpreter who could mouth the speaker's words. It is undisputed that defendant employed sign interpreters who could perform the function of mouthing the speaker's words.

basis for a verdict that finds these efforts inadequate and lacking in good faith. *See Price*, 93 F.3d at 1250. A reasonable jury could have concluded that neither the efforts by plaintiff's supervisors to manage the multi-party meetings in an attempt to facilitate plaintiff's participation in the meeting, nor the installation of special equipment, such as high-intensity projectors or special telephones, nor the elimination of travel requirements were good faith attempts to accommodate plaintiff's difficulty in participating in multi-party meetings, as a reasonable jury could conclude that these accommodations, alone, would not be adequate. For example, the installation of special telephones and the relief from travel requirements had no impact on plaintiff's ability to participate in multi-party meetings. Additionally, a reasonable jury could have concluded that management of the meetings by plaintiff's supervisors and the use of high-intensity projectors provided only minimal assistance to plaintiff in these meetings and that because these efforts were insufficient on their face, they were not good faith efforts to accommodate plaintiff's disability.

While the record supports a finding that defendant acted in good faith, a contrary finding is also well-supported. Thus, the issue of defendant's good faith was quintessentially an issue for the jury to resolve. And, the jury's verdict on this issue should not be disturbed where, as here, it is am-

ply supported by the record construed in the light most favorable to plaintiff.[13]

## III.

■ As part of its equitable powers under the Rehabilitation Act, a district court has broad discretion to fashion remedies to make the plaintiff whole for injuries resulting from a violation of the Rehabilitation Act. *See Franks v. Bowman Transp. Co.*, 424 U.S. 747, 763–64, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976). Under 42 U.S.C. § 2000e–5(g), equitable relief can include, but is not limited to, "reinstatement or hiring of employees, with or without back pay ... or any other equitable relief as the court deems appropriate." *Id.* Thus, the Rehabilitation Act, through the equitable damages provision established under Title VII of the 1964 Civil Rights Act,[14] vests courts with broad discretion to order equitable relief as required in the circumstances of a particular case. *See Franks*, 424 U.S. at 763, 96 S.Ct. 1251.

### A. *Entitlement to Equitable Relief*

■ The Supreme Court has established that a prevailing plaintiff under Title VII is presumptively entitled to back pay. *See Albemarle Paper Co. v. Moody*, 422 U.S. 405, 421, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975). More specifically, the rule is that "given a finding of unlawful discrimination, back pay should be denied only for reasons which ... would not frustrate the central statutory purposes [of Title VII, which are] eradicating discrimi-

---

**13.** Because defendant did not move for a new trial under Rule 59, Fed.R.Civ.P., there is no occasion to weigh the evidence and consider whether the verdict is manifestly against the weigh of the evidence. *See Mattison v. Dallas Carrier Corp.*, 947 F.2d 95, 100 (4th Cir.1991) (noting that a new trial should be granted only if "the verdict is against the weight of the evidence, or is based upon evidence which is false, or will result in a miscarriage of justice").

**14.** Equitable relief for violations of the Rehabilitation Act are governed by the equitable relief provisions set forth in Title VII of the 1964 Civil Rights Act, 42 U.S.C. § 2000e–5(g). *See* 29 U.S.C. § 794a. For the sake of clarity, the remainder of this Opinion will utilize Title VII and the Rehabilitation Act interchangeably.

nation ... and making persons whole for injuries suffered through past discrimination." *Id.* Plaintiff argues that because no exceptional circumstances militate against an award of back pay, she is entitled to back pay from the date she was placed on disability retirement until the date of the judgment and front pay for some period of time into the future.

■ Defendant argues that plaintiff is not entitled to back pay because the lost wages plaintiff seeks to recover are not causally connected to defendant's unlawful conduct. *See Patterson v. Greenwood Sch. Dist. 50,* 696 F.2d 293, 296 (4th Cir.1982) (denying back pay award because plaintiff could not establish that she would have been promoted absent discrimination). This case, defendant argues, is unlike a typical discrimination case—such as wrongful termination or denial of a promotion—where there is a clear, causal connection between lost wages and the unlawful conduct. Here, defendant contends, neither a back pay nor a front pay award is warranted because defendant's unlawful conduct—the failure to provide reasonable accommodations—did not result in plaintiff's discharge and claim for lost wages. Instead, any lost wages were the result of plaintiff's voluntary pursuit of a medical disability retirement. *See Brady v. Thurston Motor Lines, Inc.,* 753 F.2d 1269, 1278 (4th Cir.1985) (noting that an "offending employer is made responsible only for losses suffered ... as a result of the discrimination").

■ Defendant's argument fails ultimately because plaintiff's pursuit and acceptance of the MDR was the direct result of defendant's failure to accommodate her disability. Simply put, when defendant failed, over an extended period of time, to accommodate plaintiff's disability—when in the summer and fall of 1997 the CIA Office of Medical Services determined that plaintiff was unable to perform the essential functions of Position 6 with or without a reasonable accommodation (a finding the jury rejected) and when defendant thereafter concluded that there were no positions in the CIA, at plaintiff's experience level, in which she could perform with or without a reasonable accommodation—she was left with no option but to pursue and accept the MDR. It follows, then, that her lost wages are a direct result of defendant's unlawful conduct. Thus, it was defendant's failure to provide plaintiff with the reasonable accommodations she sought—to which the jury found she was legally entitled—that compelled plaintiff to seek and accept the MDR. In a real sense, plaintiff's claim for lost wages is the result of discrimination, and she is thus entitled to some equitable relief in the form of back pay or front pay to place her in the position she would have enjoyed absent discrimination. *See Albemarle,* 422 U.S. at 421, 95 S.Ct. 2362.[15]

**B.** *Amount of Back Pay and Front Pay—Mitigation*

■ While a Title VII plaintiff is generally entitled to back pay "as a matter of course,"[16] the right of a plaintiff to claim back pay is limited by a claimant's statutory duty to mitigate the employee's

---

**15.** To be sure, reinstatement is often a preferred remedy. *See Duke v. Uniroyal, Inc.,* 928 F.2d 1413, 1423 (4th Cir.1991). Yet, this remedy seems ill-suited to the instant circumstances, because it would likely prolong rather than end this dispute. Moreover, the CIA claims it has no suitable positions that are vacant and in which plaintiff's disability can be reasonably accommodated, and plaintiff, understandably, is reluctant to accept reinstatement without a guarantee of accommodation. Accordingly, in these circumstances, reinstatement is not an appropriate remedy.

**16.** *Martin v. Cavalier Hotel Corp.,* 48 F.3d 1343, 1358 (4th Cir.1995).

damages. Section 2000e–5(g)(1) provides in pertinent part that "[i]nterim earnings or *amounts earnable with reasonable diligence* by the person or persons discriminated against shall operate to reduce the back pay otherwise allowable." (emphasis added). Because the failure to mitigate is an affirmative defense, defendant bears the burden of proof to show that plaintiff, a victim of unlawful discrimination, has failed to be "reasonably diligent in seeking and accepting new employment substantially equivalent to that from which she was discharged." *Brady,* 753 F.2d at 1273; *see Ford Motor Co. v. EEOC,* 458 U.S. 219, 232, 102 S.Ct. 3057, 73 L.Ed.2d 721 (1982); *Martin v.. Cavalier Hotel Corp.,* 48 F.3d 1343, 1358 (4th Cir.1995). Nevertheless, a "plaintiff cannot remain idle after an unlawful discharge and receive back pay for that period where he was not actively seeking employment." *Brady,* 753 F.2d at 1273. Instead, if plaintiff cannot find comparable employment, she must seek a different job, even if it is lower-paying.[17]

■ Reasonable diligence does not accurately describe plaintiff's mitigation efforts since August 11, 1998, the date plaintiff retired from the CIA on medical disability. Diligence implies persistence and industriousness, and plaintiff's efforts cannot be said to have been either persistent or consistently industrious.[18] Rather, since her retirement, plaintiff has made at best only modest or intermittently persistent efforts to seek employment. Specifically, the record reflects that from August 11, 1998 until the present, plaintiff's efforts may be summed up as follows: (i) she applied for only ten positions,[19] (ii) she placed her resume in a nationwide human resources database, and (iii) she searched vacancy announcements periodically. Significantly, plaintiff's efforts to locate employment diminished markedly following her relocation to California in April 1999. Since that time, plaintiff's efforts have been limited to sending resumes to two individuals at the University of California and one to the Naval Warfare Center in Norco, California. Indeed, by April 1999, plaintiff had virtually abandoned any active search for an alternative position. Taken as a whole, plaintiff's post-retirement efforts, particularly after April 1999, do not reflect reasonable diligence, and therefore suggest that plaintiff has not sustained her duty to mitigate damages.

■ It follows that plaintiff's award of back pay must be limited to the time in which it would be reasonable to expect that plaintiff could find a suitable position. *See, e.g., Quint v. A.E. Staley Mfg. Co.,* 172

---

**17.** In *Ford Motor Co.,* the Supreme Court held that a plaintiff "need not go into another line of work, accept a demotion, or take a demeaning position." *Ford Motor Co.,* 458 U.S. at 231, 102 S.Ct. 3057. Yet, the Supreme Court also acknowledged that some lower courts have held that "after an extended period of time searching for work without success, a claimant must consider taking a lower-paying position." *Id.* at 231 n. 16, 102 S.Ct. 3057. For example, in *Brady,* the Fourth Circuit noted that claimants under the National Labor Relations Act "must ... accept lower paying" employment when the search for substantially similar employment proves futile. *Brady,* 753 F.2d at 1274. Because Title VII's back pay provision was "expressly modeled" on the National Labor Relations Act, the requirement to seek lower paying employment applies to the Title VII claimant as well. *See id.* at 1273 (citing *Albemarle,* 422 U.S. at 419 & n. 11, 95 S.Ct. 2362); *Cf. Donnelly v. Yellow Freight Syst., Inc.,* 874 F.2d 402, 411 (7th Cir.1989) (holding that accepting a part-time position in a different field satisfies plaintiff's duty to mitigate).

**18.** Webster's II New Riverside University Dictionary (1984) defines "diligence" as "persistent application to one's work" or "assiduous effort."

**19.** This includes two positions that plaintiff applied for on August 3, 1998.

F.3d 1, 8, 16 (1st Cir.1999) (upholding an 18–month back pay award where former employee failed to mitigate damages as a reasonable time to locate employment). In making the determination of a reasonable period of time, plaintiff correctly notes that because of her pronounced hearing loss, it might take her longer to find suitable employment than it would for a person without a comparable disability. And, fairness requires that the mitigation calculus account for the fact that some potential employers may violate the law and discriminate against plaintiff by refusing to hire her on account of her disability. Still, it is reasonable to assume, given the law, that such employers are the exception, not the rule. Thus, while plaintiff's disability warrants an extension of the period of time in which it would be reasonable to expect that she would find employment, it does not justify an assumption that plaintiff, given her sterling credentials and significant experience, is unemployable. In short, plaintiff's contention that her job search is futile is not persuasive.[20] To be sure, it may take longer for an individual with a pronounced hearing loss to locate employment, but it is not credible to believe that all employers would refuse to hire plaintiff given her educational credentials and her background and experience in science and engineering. Instead, it is reasonable to believe that had plaintiff diligently sought alternative employment, she would have found employment within twenty-four months of her departure from the CIA. Accordingly, while plaintiff's disability warrants consideration in setting a reasonable time to find suitable employment, it does not justify ending plaintiff's duty to mitigate damages. Thus, her back pay award is reasonably and appropriately limited to a period of twenty-four months. *See, e.g., Quint,* 172 F.3d at 8.

## C.   Collateral Source Doctrine

Since August 11, 1998, the date she commenced her MDR, plaintiff has been receiving an annuity from the federal government as a result of her participation in the Federal Employees Retirement System ("FERS").[21] Throughout her tenure at the CIA, plaintiff contributed approximately .82 percent of her salary to FERS. These contributions account for approximately six percent of the benefits she currently receives. Defendant's contributions on behalf of plaintiff account for the remaining amount of plaintiff's retirement annuity.

Defendant, understandably, argues that any equitable award for lost wages must be offset by plaintiff's FERS benefits.[22] Otherwise, defendant argues, plaintiff would be compensated twice for the same injury. Plaintiff counters that the collateral source doctrine bars such an offset. Under this doctrine, "when the victim of a tort receives payment for his

---

**20.** Plaintiff cites *EEOC v. Service News Company,* 898 F.2d 958 (4th Cir.1990) in support of her contention that because of her unsuccessful efforts in seeking employment both before and after she left the CIA, she is justified in not continuing her search for employment as further efforts would be futile. Yet, *Service News* does not support this contention; it held only that discontinuing a job search for a limited period of time while that plaintiff was pregnant was justified in light of "her belief in the futility of further efforts." *Id.* at 963. *Service News* does not support plaintiff's contention that she is entitled to recover lost wages for an indefinite period into the future or, at a minimum, for four and a half years.

**21.** Plaintiff has received the following payments from FERS: $13,181 in 1998, $36,846 in 1999, $18,324 in 2000, and $1,565 per month in 2001.

**22.** Defendant does not seek an offset of the social security benefits plaintiff is also currently receiving. Accordingly, defendant's entitlement to an offset of these benefits will not be considered.

injuries from a collateral source, that is, a source independent of the tortfeasor, the payment should not be deducted from the damages owed by the tortfeasor." *See Ward v. Allied Van Lines, Inc.*, 231 F.3d 135, 139 (4th Cir.2000). The doctrine's underlying rationale is two-fold: (i) an individual who purchases insurance against an accident should not be forced to pay the proceeds of that insurance to the person who caused the accident, and (ii) a third-party who intends to benefit the injured party should not be "compelled to benefit the injurer instead." *Hunter v. Allis–Chalmers Corp., Engine Div.*, 797 F.2d 1417, 1429 (7th Cir.1986). Given these principles, the question presented is whether the collateral source doctrine bars an offset of plaintiff's FERS annuity payments.

*Fariss v. Lynchburg Foundry*, 769 F.2d 958 (4th Cir.1985) provides the answer to this question.[23] There, the Fourth Circuit, citing the equitable nature of a back pay award, offset benefits from a back pay award in an Age Discrimination in Employment Act case. The key to the result in *Fariss* was the equitable nature of a back pay award.[24] In this regard, Chief Judge Wilkinson, speaking for a unanimous panel, noted that "if an employ-

er's payment would not have been made had the employee continued working, it exceeds the damages necessary to make the plaintiff whole." *Id.* at 966 (citing *Cline v. Roadway Express, Inc.*, 689 F.2d 481, 490 (4th Cir.1982)). In other words, in the absence of a benefits offset, "plaintiff would enjoy the rewards from the employer both of working and not working." *Fariss*, 769 F.2d at 967. Such a result, in the Fourth Circuit's view, would be inappropriate, as the "make whole" back pay discrimination remedy should not result in providing a windfall to a victim of unlawful discrimination. *See id.*[25] For these reasons, the court upheld a benefits offset to the back pay award. For the same reasons, the same result should obtain here. In this case, as in *Fariss*, equitable principles require an appropriate offset to ensure that plaintiff is only made whole and is not awarded a windfall. Also, here, as in *Fariss*, the offset is warranted as plaintiff's FERS annuity payments are from her employer, not a collateral source. *See supra* note 24.

The result reached here—a partial offset[26]—finds firm support in its consistency with the Supreme Court's statement of the twin goals of the back pay award: to make the victim whole and to deter future un-

---

23. Plaintiff argues *Price* provides the appropriate standard. *See United States v. Price*, 288 F.2d 448 (4th Cir.1961). Plaintiff's argument is unpersuasive, as *Price* was not a discrimination case applying a federal equitable remedy, but was a Federal Tort Claims Act case applying Virginia law.

24. *See Fariss*, 769 F.2d at 966; *see also* 42 U.S.C. § 2000e–5 (providing that the court can order equitable relief "as the court deems appropriate"); *Naton v. Bank of Cal.*, 649 F.2d 691, 700 (9th Cir.1981) (holding that district court had discretion to deduct collateral benefits from back pay award). In addition, the Fourth Circuit noted, in a footnote, that an offset was not warranted because the benefits at issue in that case were not from a collateral source; the benefits were from the

employer. *See Fariss*, 769 F.2d at 966 & n. 10.

25. Plaintiff concedes that she will receive a windfall absent a benefits offset. But she argues that, as a victim of discrimination, she is entitled to this windfall. This argument fails in the face of *Fariss*.

26. The proper offset is the amount of contributions that defendant made to the FERS system. The portion of the FERS annuity attributable to contributions by plaintiff is collateral, and defendant is not entitled to an offset of these payments. The parties stipulated that the defendant's contributions amounted to 94% of the benefits with plaintiff contributing the remaining amount.

lawful conduct. *See Albemarle,* 422 U.S. at 421, 95 S.Ct. 2362. First, plaintiff will receive the full amount of wages she would have received if she were still employed at the CIA. Nor will this result benefit the defendant, because it must still pay plaintiff's lost wages in full.[27] Second, the deterrent effect of the back pay award will not be weakened because the amount awarded is still substantial. As a result of defendant's unlawful conduct, defendant must pay $25,000 in compensatory damages plus equitable relief in the form of back pay in the amount of $108,551.30 plus prejudgment interest at the statutory rate.[28] While this award is less than the amount plaintiff sought, it is sufficient to "spur [defendant] to eliminate discriminatory practices." *Wright v. National Archives and Records Serv.,* 609 F.2d 702, 726 (4th Cir.1979); *see also Carpenter v. Stephen F. Austin State Univ.,* 706 F.2d 608 (5th Cir.1983) (noting that a back pay award, rather than just prospective relief, is necessary to satisfy *Albemarle* ). Accordingly, in order to effectuate *Albemarle* 's "make whole" remedy of back pay awards and because "the benefit [plaintiff] is receiving is not from a third party but is from the same party whom [she] is seeking damages," [29] the back pay award must be offset by the portion of the FERS benefit that is the result of government contributions.[30]

---

**27.** *See Robinson v. Lorillard Corp.,* 444 F.2d 791, 804 (4th Cir.1971) ("[B]ack pay is not a penalty imposed as a sanction for moral turpitude; it is compensation for the tangible economic loss resulting from an unlawful employment practice."). When the FERS benefit, minus plaintiff's contribution, is added with the back pay award, plaintiff will receive her full salary. All of these payments come from the defendant. Accordingly, defendant does not reap a windfall from the offset.

**28.** Had plaintiff continued in her employment at the CIA for twenty-four months, she would have earned $26,600 from August 11, 1998 through December 31, 1998, $79,617 in 1999, and $51,740.60 from January 1, 2000 through August 10, 2000. Accordingly, the final back pay award is determined by taking what plaintiff's salary would have been for the twenty-four month period of time following her retirement from the CIA and increasing it by five to account for contributions defendant would have made to the federal government's Thrift Savings Plan. Then, ninety-four percent of the benefits plaintiff received from FERS is deducted to arrive at the final back pay amount. *See supra* note 21. In addition to the compensatory and equitable relief, plaintiffs might be entitled to an award of attorneys' fees. *See* Equal Access to Justice Act, 28 U.S.C. § 2412(d)(1)(B).

**29.** *Smith v. Office of Personnel Management,* 778 F.2d 258, 263 (5th Cir.1985) (upholding offset of disability compensation in Age Discrimination in Employment Act case); *see also Fariss,* 769 F.2d at 967 (noting that courts cannot "ignore the reality" of plaintiff's financial position in determining appropriate equitable relief).

**30.** It is not clear that other circuits would reach the same result. *See Phillips v. Western Co. of N. Am.,* 953 F.2d 923, 931 (5th Cir. 1992); *Arneson v. Callahan,* 128 F.3d 1243, 1248 (8th Cir.1997). In these cases, the critical question when both plaintiff and defendant contribute to a benefit plan is whether the benefit is intended to compensate employees in the event of unlawful conduct by the employer, that is, as a litigation settlement fund, or is intended instead to serve some other purpose, such as a retirement plan designed to attract and maintain employees and to carry out an important social policy, such as unemployment compensation.

While FERS is a retirement plan, payable based on an employee's age and the length of his or her employment, this fact, alone, does not compel the result that no offset is warranted here. Significantly, while FERS has the attributes of a typical retirement plan, it can also be described as a program to compensate federal employees for unlawful conduct. In guidelines published by the United States Office of Personnel Management, United States Attorneys are given authority to utilize FERS as a tool to settle litigation as long as the settlement award does not exceed the equitable award that a court could order.

While an offset is appropriate in these circumstances, it might not be proper in all instances involving employer-provided benefits. This is so because in each case the twin purposes of the back pay award must be satisfied. Thus, an offset is proper only where, as here, the back pay awarded fully compensates the plaintiff for her lost wages and serves to deter future violations of the Rehabilitation Act. Because these goals are satisfied here, an offset of the CIA's contributions is appropriate.

## IV.

In sum, when the FERS benefits are offset from the back pay award, plaintiff is entitled to equitable relief in the form of back pay in the amount of $108,551.30 plus prejudgment interest at the statutory rate.

An appropriate Order will issue.

See Guidelines for Settlement of Federal Personnel Actions, United States Office of Personnel Management, *available at* http://www.opm.gov/legal/html/guidelns.htm (as of Mar. 19, 2001). In addition, if no offset were ordered, these Guidelines suggest that the Office of Personnel Management might require plaintiff to refund the benefits she has received. *See id.* (noting that a "litigant may not receive both back pay and [FERS benefits] *for the same period of time* ") (emphasis added). Moreover, a determination that the FERS benefits are not a litigation settlement fund does not end the analysis, as the award of back pay is equitable in nature and awarded at the discretion of the district court. And, as noted, in the case at bar, the principles of equity compel an offset of the CIA's contributions to the FERS annuity benefit plaintiff currently receives. Accordingly, even assuming *arguendo* the applicability of the test proposed by the Fifth Circuit and the Eighth Circuit, an offset is still warranted in the circumstances presented here.