**CSX TRANSPORTATION, INC.,**
**Appellant–Defendant,**

**v.**

**Robert D. GARDNER, Appellee–**
**Plaintiff.**

No. 49A02–0610–CV–917.

Court of Appeals of Indiana.

Sept. 18, 2007.

Bruce A. Hugon, Stuart & Branigin LLP, Indianapolis, IN, Alice E. Loughran, Steptoe & Johnson LLP, Washington, D.C., Attorneys for Appellant.

Paul J. Passanante, Dawn M. Mefford, Simon Passanante, P.C., St. Louis, MO, John T. Roach, Mann Law Firm, Terre Haute, IN, Attorneys for Appellee.

Harold Abrahamson, Abrahamson, Reed & Bilse, Hammond, IN, Daniel Saphire, Louis P. Worchot, Association of American Railroads, Washington, D.C., Attorneys for Amicus Curiae the Association of American Railroads.

## OPINION

ROBB, Judge.

### Case Summary and Issue

Following a jury trial, at which the jury found CSX Transportation, Inc., liable for injuries sustained by an employee, Robert Gardner, CSX appeals the trial court's denial of its post-trial motion to offset the amount awarded to Gardner by the amount CSX had contributed to a fund from which Gardner was receiving a disability annuity pursuant to the Railroad Retirement Act (the "RRA"). CSX raises the sole issue of whether it is entitled to setoff this amount as a matter of law. Concluding that CSX is not entitled to setoff this amount, we affirm.

### Facts and Procedural History

On May 13, 2003, Gardner was working as a locomotive engineer for CSX and was injured when he was thrown from a train. Gardner injured his neck, back, and right knee in the accident, and had been unable to return to work at the time of the trial. Shortly after the accident, Gardner applied for an occupational disability annuity with the Railroad Retirement Board (the "Board"), which administers a disability

and retirement fund established by the RRA (the "RRA Fund"). The Board granted his application and has been paying him $35,000 per year since December 2003, and will continue to do so until Gardner reaches the age of 62, at which point it will pay him his retirement annuity instead.

Gardner also filed a complaint against CSX under the Federal Employers' Liability Act ("FELA"), alleging that CSX's negligence caused his injury. The case proceeded to trial, where the jury found that CSX was 100 percent liable for Gardner's injuries and awarded Gardner $605,500 in damages. CSX filed a post-trial motion to setoff the amount that CSX had contributed to the RRA Fund on Gardner's behalf from the FELA award. The trial court denied this motion, citing the Supreme Court case of *Eichel v. New York Cent. R.R. Co.*, 375 U.S. 253, 84 S.Ct. 316, 11 L.Ed.2d 307 (1963), as controlling. CSX now appeals.[1]

### Discussion and Decision [2]

CSX argues that it is entitled to setoff because it in effect is being required to pay twice for Gardner's lost wages; first, it contributed to the fund used to pay Gardner's disability annuity; and second, it compensated Gardner for his lost wages as part of the FELA award. Therefore, CSX argues that Gardner received a windfall at CSX's expense. Gardner argues that the annuity he receives pursuant to the RRA Fund should not be regarded as payment from the tortfeasor CSX, but as payment from a "collateral source," and

that the trial court properly disallowed setoff.

### I. The Applicable Law and Standard of Review

■ The parties do not dispute any facts relevant to this appeal. The question of whether a railroad's contributions to the RRA Fund should be setoff against the FELA award is a pure question of law. *See Davis v. Odeco, Inc.*, 18 F.3d 1237, 1245 (5th Cir.1994), *cert. denied*, 513 U.S. 819, 115 S.Ct. 78, 130 L.Ed.2d 32 (1994). Therefore, our standard of review is de novo, and we will pay no deference to the trial court's decision.

■ As Gardner filed his claim under FELA, federal law governs this case. *See Dice v. Akron, Canton & Youngstown R.R. Co.*, 342 U.S. 359, 361, 72 S.Ct. 312, 96 L.Ed. 398 (1952) (noting that "only if federal law controls can the federal Act be given that uniform application throughout the country essential to effectuate its purposes"). Indiana law,[3] or the law of any other state, has no applicability as to liability or damages. *See S. Buffalo Ry. Co. v. Ahern*, 344 U.S. 367, 371–72, 73 S.Ct. 340, 97 L.Ed. 395 (1953).

### II. The Applicable Statutes

#### A. The RRA

This current version of the RRA was enacted in 1974, and significantly altered its predecessor, the Railroad Retirement Act of 1937 (the "1937 Act"). The current version "resembles both a private pension program and a social welfare plan." *His-*

---

1. The Association of American Railroads (the "AAR"), a nonprofit trade organization representing Amtrak and many of the nation's major freight railroads, has filed an amicus curiae brief aligned with CSX.

2. Because we affirm the trial court on other grounds, we need not address Gardner's argument that the general nature of the jury's

verdict, which did not indicate what portion of the award was attributable to Gardner's lost wages, precludes setoff.

3. The Indiana legislature has altered the common law regarding the collateral source doctrine. *See* Ind.Code § 34–44–1–2.

*quierdo v. Hisquierdo,* 439 U.S. 572, 574, 99 S.Ct. 802, 59 L.Ed.2d 1 (1979). It establishes two tiers of benefits: Tier I, which provides amounts essentially equivalent to social security benefits; and Tier II, which provides retirement benefits over and above social security benefits and operates similarly to other industrial pension systems. *See* Railroad Retirement Board, Railroad Retirement Handbook 2006, at 5, available at www.rrb.gov/pdf/opa/ handbook.pdf (hereinafter the "Board Handbook"). The Board, "an independent agency in the executive branch," administers the RRA. 45 U.S.C. § 231f.

The RRA provides that railroad employees who are injured and unable to continue their regular work may receive either total disability or occupational disability annuities. *See* 45 U.S.C. § 231a(a)(1)(iv), (v). Payments under the RRA are not premised on the injury occurring as a result of the negligence of the railroad. *See* 45 U.S.C. § 231a. In order to qualify for occupational disability, the employee must be permanently disabled for work in his or her regular railroad occupation and either have at least twenty years of railroad service or be at least sixty years old and have ten years of railroad service. *See* 45 U.S.C. § 231 a(a)(1). In order to receive total disability annuities, the employee must have at least ten years of railroad service and be disabled for any kind of regular employment. *Id.* The amount of an employee's annuity depends on the length of the employee's employment. *See* 45 U.S.C. § 231b(b). The primary difference between the benefits under RRA and the 1937 Act is that under the 1937 Act,

many employees received benefits under both the 1937 Act and the Social Security Act, leading to a windfall for railroad employees also employed in other fields. *See* Board Handbook, *supra,* at 4. The current RRA phased out these dual benefits, but also improved the benefits by easing eligibility requirements and increasing the amount of the annuities paid to widows and other survivors. *Id.* at 5–6.

The RRA Fund is supported in part by a tax on both the railroad companies and the railroad employees. 26 U.S.C. §§ 3201, 3211. Both the railroads and their employees pay taxes into Tier I at a rate equal to social security taxes. *See id.* For Tier II, the tax rate varies, and is published annually by the Department of the Treasury. *See* 26 U.S.C. 3241(d). The Tier II annual tax rate for employers is significantly higher than that for employees. *E.g.,* 71 Fed.Reg. 67,709 (Nov. 22, 2006) (an employer is taxed 12.1 percent and an employee is taxed 3.9 percent of the employee's compensation). For the fiscal year 2006, the aggregate of the employee and employer taxes made up 48.4 percent of the total amount contributed to the RRA Fund. *See* United States Railroad Retirement Board, 2007 Annual Report, at 11, available at www.rrb.gov/pdf/ opa/AnnualRprt/AnnualReport.pdf (hereinafter, the "Board Report"). The remainder of the funding comes from the financial interchange with social security trust funds (35.7%), national railroad investment trust transfers (9.7%), federal income taxes (4.7%), general appropriations (1.0%), and interest on investments (0.6%).[4] *Id.* The

---

**4.** CSX claims in its brief that "Tier 2 is designed to be actuarially sound and self-supporting; and there is no commingling with other government funds." Appellant's Brief at 20. However, the Board Report indicates that in fiscal year 2006, the account used to pay Tier II benefits received $947 million in

transfers from the National RR Investment Trust, which is funded by whatever is not needed under either the Tier I or Tier II account to pay current benefits and administrative expenses, and $38 million in transfers from the Social Security Equivalent Benefit Account, which is funded in large part by the

primary difference between the current funding structure and that in place prior to 1974, is that employees and employers were previously taxed at an equal rate, while now the employer pays a significantly greater amount than does the employee. *See* Board Handbook, *supra*, at 4.

## B. FELA

In 1908, Congress enacted FELA to deal with the numerous injuries sustained by railroad employees. *See Norfolk S. Ry. Co. v. Sorrell*, —— U.S. ——, 127 S.Ct. 799, 805, 166 L.Ed.2d 638 (2007). Under FELA, railroad companies "shall be liable in damages to any person suffering injury while he is employed by such carrier ... for such injury ... resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier." 45 U.S.C. § 51. As the statute's text indicates, FELA is not a workers' compensation scheme, as recovery under FELA is limited to cases in which the employer was at fault. *See Sorrell*, 127 S.Ct. at 805; *Consol. Rail Co. v. Gottshall*, 512 U.S. 532, 543, 114 S.Ct. 2396, 129 L.Ed.2d 427 (1994). In this regard, FELA "does not make the employer the insurer of the safety of his employees while they are on duty. The basis of his liability is his negligence, not the fact that injuries occur." *Gottshall*, 512 U.S. at 543, 114 S.Ct. 2396 (quoting *Ellis v. Union Pac. R.R. Co.*, 329 U.S. 649, 653, 67 S.Ct. 598, 91 L.Ed. 572 (1947)).

## III. *Eichel v. New York Central Railroad Company*

Gardner contends that the outcome of this case is controlled by *Eichel v. New York Cent. R.R. Co.*, 375 U.S. 253, 84 S.Ct. 316, 11 L.Ed.2d 307 (1963). In *Eichel*, a former employee of the railroad filed a FELA claim and obtained a judgment against the railroad. The issue before the Supreme Court was whether evidence that the plaintiff had been receiving disability payments under the 1937 Act was admissible in regard to the extent of the plaintiff's injury and as to whether the plaintiff was malingering. *Id.* at 253–54, 84 S.Ct. 316. The Supreme Court held that such evidence was inadmissible as the employee's "receipt of collateral social insurance benefits involves a substantial likelihood of prejudicial impact." *Id.* at 255, 84 S.Ct. 316. In so holding, the Court noted that the railroad did "not dispute that it would be highly improper for the disability pension payments to be considered in mitigation of the damages suffered by petitioner." *Id.* at 254, 84 S.Ct. 316.

The Court then recognized:

> The Railroad Retirement Act is substantially a Social Security Act for employees of common carriers.... The benefits received under such a system of social legislation are not directly attributable to the contributions of the employer, so they cannot be considered in mitigation of the damages caused by the employer.

*Id.* (quoting *New York, New Haven & Hartford R. Co. v. Leary*, 204 F.2d 461, 468 (1st Cir.1953), *cert. denied*, 346 U.S. 856, 74 S.Ct. 71, 98 L.Ed. 370 (1953)).

CSX argues that *Eichel* is not controlling because: 1) the Court's comment that payments pursuant to the 1937 Act cannot be considered in mitigation is dicta, as the defendant in that case had conceded that the disability benefits could not be setoff

---

financial interchange with social security trust funds. *See id.* at Table 2. So, although we recognize that the tax levied on railroads and their employees accounts for the majority of the funds in the account used to pay Tier II

benefits, it is inaccurate to say that the railroad industry completely finances Tier II benefits without any assistance from the government.

from the negligence award; and 2) the provisions of the RRA have made the logic underlying the Court's statements in regard to the 1937 Act inapplicable.

We initially note that numerous courts have issued opinions indicating that the language in *Eichel* is not dicta, and cite *Eichel* in holding that railroads may not offset liability in FELA suits by the amount they have contributed to the RRA. *See Green v. Denver & Rio Grande W. R. Co.,* 59 F.3d 1029, 1032–33 (10th Cir.1995), *cert. denied,* 516 U.S. 1009, 116 S.Ct. 565, 133 L.Ed.2d 490 (1995) (holding that *Eichel* "compels the conclusion that the collateral source rule prohibits admission of RRA disability benefits in a FELA case"); *Clark v. Burlington N., Inc.,* 726 F.2d 448, 451 n. 2 (8th Cir.1984) ("The collateral source rule undisputedly applies to payments made under the Railroad Retirement Act . . . ." (citing *Eichel* )); *Prater v. Consol. Rail Corp.,* 272 F.Supp.2d 706, 716 (N.D.Ohio 2003) ("[Plaintiff's] receipt of RRB benefits . . . cannot be offset against plaintiff's lost wages under *Eichel* "); *Starling v. Union Pac. R.R. Co.,* 203 F.R.D. 468, 483 (D.Kan.2001); *Hall v. Minn. Transfer Ry. Co.,* 322 F.Supp. 92, 96 n. 5 (D.Minn.1971) (citing *Eichel* and other cases as "considerable authority for the proposition that the employer cannot set off amounts it has contributed to the Railroad Retirement Fund"); *Snipes v. Chicago, Cent. & Pacific R.R. Co.,* 484 N.W.2d 162, 166 (Iowa 1992) ("The federal law is well settled that, under the FELA, the collateral source rule operates to prevent consideration of RRA disability pension payments in mitigation of damages suffered by an injured employee." (citing *Eichel* )); *Ill. Cent. Gulf R. Co. v. Haynes,* 592 So.2d 536, 541 (Ala.1991); *Laird v. Ill. Cent. Gulf R.R. Co.,* 208 Ill.App.3d 51, 153 Ill.Dec. 94, 566 N.E.2d 944, 955 (Ill.Ct.App. 1991); *Melton v. Ill. Cent. Gulf R. Co.,* 763

S.W.2d 321, 326 (Mo.Ct.App.1988) (citing *Eichel* to support its holding that evidence of payments made to the RRA is inadmissible in FELA actions and that the trial court properly denied set off); *Houghton v. Leinwohl,* 135 Vt. 380, 376 A.2d 733, 737 (Vt.1977).

We also note that the United States District Court for the District of Kansas, the Missouri Supreme Court, and the Illinois Court of Appeals have rejected the general argument that CSX raises here. *See Starling,* 203 F.R.D. at 483 (although railroad introduced evidence indicating that it had funded approximately 75% of the RRA disability benefits, court was "wholly unpersuaded" that *Eichel* and *Green* were not binding); *Giddens v. Kansas City S. Ry. Co.,* 29 S.W.3d 813, 824 (Mo.2000) (per curiam), *cert. denied,* 532 U.S. 990, 121 S.Ct. 1644, 149 L.Ed.2d 502 (2001) (holding that *Eichel* forecloses the railroad's argument that the collateral source doctrine should not apply because the railroad funds the annuities disbursed by the Board); *Laird,* 153 Ill.Dec. 94, 566 N.E.2d at 955 (noting that although the railroad introduced evidence that it contributed the majority of the funds supporting the plaintiff's disability payments, "defendant has not brought to our attention any FELA cases which distinguish the holding of the Supreme Court in *Eichel* ").

Neither CSX nor the AAR had cited a case indicating that *Eichel* should not control here, and research has likewise disclosed none. However, both CSX and AAR recognize that their position is not supported by case law, and argue instead that: 1) cases following *Eichel* are either incorrect or inapplicable, as *Eichel* was decided before the changes made to the administration of the RRA; and 2) based on the current RRA, federal common law

indicates that CSX is entitled to a setoff.[5] Although we recognize that significant caselaw indicates that *Eichel* remains binding and controlling precedent mandating that RRA disability annuities are not setoff from FELA awards, we need not base our decision on *Eichel,* as we conclude that application of the collateral source doctrine under federal law precludes setoff. Therefore, we will address their argument on the merits, and not merely cite *Eichel* as controlling and binding precedent.

## IV. The Collateral Source Rule

■ The collateral source rule provides that a tortfeasor may not mitigate damages by setting off payments made to the plaintiff by an independent source. *Mead v. Nat'l R.R. Passenger Corp.,* 676 F.Supp. 92, 93–94 (D.Md.1987). "This doctrine establishes an exception to the general rule that damages in negligence actions must be compensatory and render the beneficiary whole." *Hughes v. Clinchfield R.R. Co.,* 289 F.Supp. 374, 375 (E.D.Tenn. 1968). The collateral source doctrine ensures that a plaintiff's recovery from the tortfeasor is not reduced based on his or her recovery from independent sources. *See Phillips v. W. Co. of N. America,* 953 F.2d 923, 931 (5th Cir.1992). Thus, the rule focuses not on the aggregate amount the plaintiff receives, but on the amount the tortfeasor pays. *See E.E.O.C. v. O'Grady,* 857 F.2d 383, 390 (7th Cir.1988). The doctrine operates to prevent a tortfeasor from paying twice for the same injury. *See Flowers v. Komatsu Mining Sys., Inc.,* 165 F.3d 554, 558 (7th Cir.1999). At the

same time, a common effect of the doctrine is that plaintiffs often recover more than necessary to make them whole on account of the injury. *See O'Grady,* 857 F.2d at 390.

■ However, the mere fact that the tortfeasor funded the source of the plaintiff's payments does not inherently preclude application of the collateral source rule. Instead, "[i] f the employer made the payment because it was obligated to do so, the collateral source rule may apply." *Falconer v. Penn Mar., Inc.,* 397 F.Supp.2d 144, 147 (D.Me.2005). In determining whether a payment is from a collateral source, courts "should look at 'the purpose and nature of the fund and of the payments,' and not merely at their source." *Russo v. Matson Nav. Co.,* 486 F.2d 1018, 1020 (9th Cir.1973) (per curiam) (quoting *Gypsum Carrier, Inc. v. Handelsman,* 307 F.2d 525, 534 n. 31 (9th Cir. 1962)). In other words, "the collateral source rule depends less upon the source of the funds than upon the character of the benefits received." *Reed v. E.I. Du Pont de Nemours and Co.,* 109 F.Supp.2d 459, 467 (S.D.W.Va.2000).

■ Therefore, the question that we must answer is whether the RRA disability annuities paid to Gardner are from a collateral source, or whether the annuities, to the extent that CSX paid taxes to the fund based on Gardner's employment,[6] should be setoff from the FELA award.

### A. 45 U.S.C. § 55

Initially, we address FELA's specific reference to the collateral source doctrine.

---

**5.** Neither CSX nor the AAR cites *Starling, Giddens,* or *Laird.*

**6.** CSX concedes that it is not entitled to setoff the full amount of the disability annuities, as to do so would clearly give CSX a windfall by entitling it to setoff payments that come from a source funded not only by its contributions, but also by other contributors. *See Rachel v.*

*Consol. Rail Corp.,* 891 F.Supp. 428, 430 (N.D.Ohio 1995) (recognizing that by arguing that the entire amount received by the plaintiff should be deducted, the defendant "ignores the potential windfall it would receive should its alleged negligence be compensated from a fund partially subsidized by Plaintiff").

To further protect railroad workers, Congress enacted a statute specifically dealing with setoffs against damages awarded under FELA.

> Any contract, rule, regulation, or device whatsoever, the purpose or intent of which shall be to enable any common carrier to exempt itself from any liability created by this chapter, shall to that extent be void: *Provided,* that in any action brought against any such common carrier under or by virtue of any of the provisions of this chapter, such common carrier may set off therein any sum it has contributed or paid to any insurance, relief benefit, or indemnity that may have been paid to the injured employee or the person entitled thereto on account of the injury or death for which said action was brought.

45 U.S.C. § 55.

CSX argues that FELA's setoff provision is inapplicable, and that many of the cases cited by Gardner rely "explicitly" on section 55, and are likewise inapplicable. CSX states that because " § 55 voids the arrangement or device, it would be absurd to apply § 55 to congressional action." Appellant's Br. at 12. Although we agree with CSX that section 55's proviso does not modify the applicable collateral source doctrine with respect to the RRA benefits, we disagree that the section is entirely inapplicable to our analysis. We also find that most of the cases cited by Gardner, although they deal with plans governed by section 55, are also applicable as they discuss general common law principles of the collateral source doctrine.

Section 55 essentially codifies the common law collateral source rule with respect to FELA actions, while at the same time broadening it in certain respects. *See Blake v. Del. & Hudson Ry. Co.,* 484 F.2d 204, 207 (2d Cir.1973) (Friendly, J., concurring) (noting that under section 55 "the railroad is entitled to set off only the premiums, not what the premiums bought"); *Lucht v. Chesapeake & Ohio Ry. Co.,* 489 F.Supp. 189, 190 (W.D.Mich.1980). As the court in *Hall* explained,

> [T]he congress which passed [section 55] apparently contemplated that the common law collateral source rule would apply in FELA cases as before that Section's enactment, subject to the directive of [the proviso] that "any sum it has contributed or paid to any insurance, relief benefit, or indemnity that may have been paid to the injured employee or the person entitled thereto on account of the injury or death for which said action was brought" may be setoff regardless of its status under the common law rule.

322 F.Supp. at 95.

In the 1800s and early 1900s, the railroad industry's "practice of obtaining waivers prior to accidents and as an incident of employment was well-known to Congress and the object of [section 55]." *Bay v. W. Pac. R.R. Co.,* 595 F.2d 514, 516 (9th Cir. 1979) (per curiam). Specifically, section 55 operates "to prevent employers being sued under section 1 from claiming as a defense that the employees bringing suit had contracted away their rights under FELA." *Lewy v. S. Pac. Transp. Co.,* 799 F.2d 1281, 1294 (9th Cir.1986). The section's proviso also "ensure[s] that the employer was given credit for money it had already paid to the employee on account of the injury." *Folkestad v. Burlington N., Inc.,* 813 F.2d 1377, 1380 (9th Cir.1987). Therefore, the proviso operates "to prevent the imposition upon an employer of double liability for one loss." *Welsh v. Burlington N., Inc., Employee Benefits Plan,* 54 F.3d 1331, 1337 (8th Cir.1995); *see Hall,* 322 F.Supp. at 95 (indicating that the proviso "was apparently intended simply to clarify the right of employers to indemnify them-

selves against potential liabilities under the FELA. . . .").

■ Clearly, the purpose of section 55 was to prevent railroads from exempting themselves from FELA liability. *See Pittsburgh, C.C. & St. L. Ry. Co. v. Miller*, 187 Ind. 684, 120 N.E. 706, 708 (1918) ("It is apparent . . . that [section 55] was aimed at all contracts and devices whereby any railroad company attempted to relieve itself from liability to its employés."). Therefore, we agree that the section should be interpreted to apply only to devices, rules, and contracts created by railroads in attempts to exempt or reduce liability. *See Nordgren v. Burlington N. R.R. Co.*, 101 F.3d 1246, 1251 (8th Cir. 1996) (" '[A]ny device whatsoever' refers only to any other creative agreements or arrangements the railroad might come up with to exempt itself from liability."); *Downer v. CSX Transp., Inc.*, 256 Va. 590, 507 S.E.2d 612, 616 (Va.1998) ("[W]e think that the application of [section 55] is limited to devices created by railroads to exempt themselves from liability."). Because the RRA does not fall under section 55, the federal common law applies. *See Sorrell*, 127 at 805 ("Absent express language to the contrary, the elements of a FELA claim are determined by reference to the common law."); *Hess v. Norfolk S. Ry. Co.*, 106 Ohio St.3d 389, 835 N.E.2d 679, 687 (Ohio 2005) (after determining that section 55 does not apply, recognizing that "the question remains whether federal common law precludes such a credit in FELA actions").

However, the fact that section 55 does not apply to RRA benefits does not mean that cases dealing with payments that fall under section 55 are inapplicable. Indeed, many of these cases, although dealing with payments that fall under section 55, discuss common law principles, *e.g., Kendig v. Consol. Rail Corp*, 671 F.Supp. 1068, 1069

(N.D.Ill.1987) (discussing the "traditional" collateral source rule); fail to mention section 55 and base their holding on the common law collateral source rule, *e.g., Green*, 59 F.3d at 1032, analyze payments under both the traditional collateral source rule and section 55, *e.g., Hall*, 322 F.Supp. at 97 (finding first that the collateral source rule prohibits setoff, and then that section 55 prohibits setoff), or recognize that the analysis in that particular case is the same under either section 55 or the common law, *e.g. Brice v. Nat'l R.R. Passenger Corp.*, 664 F.Supp. 220, 222 (D.Md.1987) ("[W]hether the issue is application of the common law collateral source rule or the propriety of a set off under 45 U.S.C. § 55, the question remains: Is [the policy] a fringe benefit or a policy of indemnity against liability for on-duty injuries?").

Nonetheless, we recognize that the analyses under section 55 and the common law can differ. *E.g., Folkestad*, 813 F.2d at 1381. When citing cases to which section 55 applies in our discussion and application of the federal common law collateral source doctrine, we will note this fact and explain how or why the cases still apply here.

B. Application of the Federal Collateral Source Rule to RRA benefits and FELA

■ Contrary to CSX's position that the funding of the source "is pivotal under the collateral source rule," appellant's br. at 22, federal courts have clearly indicated that "[t]he mere fact that the employer-tortfeasor has contributed money (by payment of premiums, contributions, etc.) to the fund from which the benefits derive does not establish that such fund may not be a collateral source." *Haughton v. Blackships, Inc.*, 462 F.2d 788, 790 (5th Cir.1972) (non-FELA action for personal injuries); *Davis*, 18 F.3d at 1244 (Jones

Act [7] case not mentioning section 55) (noting that focusing solely on the source of the funds "could yield absurd results"); *Phillips,* 953 F.2d 923 (citing *Haughton* ) (Jones Act case not discussing section 55); *Gypsum Carrier, Inc. v. Handelsman,* 307 F.2d 525, 534–35 (9th Cir.1962) (Jones Act case not discussing section 55); *United States v. Price,* 288 F.2d 448, 450 (4th Cir.1961) (Federal Tort Claims Act case) ("The plaintiff may receive benefits from the defendant himself which, because of their nature, are not considered double compensation for the same injury but deemed collateral."). Instead, "application of the collateral source rule depends less upon the source of funds than upon the character of the benefits received." *Haughton,* 462 F.2d at 790; *see also Mead,* 676 F.Supp. at 94 (FELA case discussing collateral source rule independently of argument regarding section 55) ("The decisive factor in determining whether the insurance proceeds at issue constitute a collateral source is the character of the benefits received."). In analyzing the character of the benefit, courts analyze five factors to determine whether the payments are in reality "fringe benefits," or are the result of payments made by the employer-tortfeasor intending to indemnify itself against future legal liability. *See Phillips,* 953 F.2d at 932; *Mead,* 676 F.Supp. at 94. These five factors are: (1) whether the employee makes any contribution to funding of the disability payment; (2) whether the benefit plan arises as the result of a collective bargaining agreement; (3) whether the plan and payments thereunder cover both work-related and nonwork-related injuries; (4) whether payments from the plan are contingent upon length of service of the employee; and (5) whether the plan contains any specific language contemplating a set-off of benefits received under the plan against a judgment received in a tort action.

*Phillips,* 953 F.2d at 932 (quoting *Allen v. Exxon Shipping Co.,* 639 F.Supp. 1545 (D.Me.1986)).[8] We will analyze these five factors in turn.

### 1. The Source of the Funds

CSX clearly contributed more to the RRA Fund than did Gardner. However, the fact that Gardner contributed at all weighs in favor of concluding that the payments constitute a fringe benefit. *See Davis,* 18 F.3d at 1245 (noting that the employee had contributed 10% of the funding in support of concluding that the pay-

---

**7.** "Laws of the United States regulating recovery for personal injury to, or death of, a railway employee apply to an action under [the Jones Act]." 46 U.S.C. § 30104(a). Therefore, FELA is applicable to Jones Act cases. *Folkestad,* 813 F.2d at 1380 n. 3.

**8.** Several other courts have analyzed these five factors in determining whether payments came from a collateral source. *See Hamlin v. Charter Twp. of Flint,* 165 F.3d 426, 435 (6th Cir.1999) (ADA case); *Webber v. Int'l Paper Co.,* 307 F.Supp.2d 119, 125 (D.Me.2004), *aff'd* 417 F.3d 229, *cert. denied,* 546 U.S. 1215, 126 S.Ct. 1436, 164 L.Ed.2d 133 (2006); *Reed,* 109 F.Supp.2d at 467; *Wendelboe v. Seariver Mar., Inc.,* 950 So.2d 826, 829 (La.Ct.App.2006); *Atl. Express Corp. v. Stamp,* 832 So.2d 829, 830 (Fla.Dist.Ct.App.2002).

Although all federal circuits have not explicitly adopted this analysis, the nature of the payments is the pivotal inquiry under the federal common law. *See United States Can Co. v. N.L.R.B.,* 254 F.3d 626, 633 (7th Cir.2001) (citing *Phillips* and analyzing the nature of the benefits received without explicitly using the five-part test); *Price,* 288 F.2d at 450. Therefore, even if the five-factor analysis has not been universally adopted, analyzing payments in this manner is at the least a relevant method of determining the nature of the payments. *See Xieng v. Peoples Nat'l Bank of Wash.,* 120 Wash.2d 512, 844 P.2d 389, 396 (Wash.1993) ("We also agree that the factors listed in *Allen* are helpful, but we do not adopt them as exclusive.").

ments were from a collateral source); *cf.* *Reed,* 109 F.Supp.2d at 466 (noting that the employer was the sole contributor to the fund). Although the fact that CSX is not completely responsible for the funding is not dispositive, "[f]unds supported in part—but not entirely—by contributions from the defendant are generally considered collateral." *O'Grady,* 857 F.2d at 390; *see also E.E.O.C. v. Enterprise Ass'n,* 542 F.2d 579, 591 (2d Cir.1976) (noting that "[w]here payment has been received from a fund obtained only in part from contributions made by the defendant, the majority rule is that no offset is allowed"); *cf. Brice,* 664 F.Supp. at 222 ("[T]he rationale behind the collateral source rule is that there is no double recovery as long as the plaintiff has contributed to the original source of the payments received.").

### 2. The Motivation for the Contributions

█ The disability payments do not arise as a result of collective bargaining, but as a result of federal legislation requiring that both the railroads and their employees pay taxes based on compensation. Courts have found the fact that plans are not the result of collective bargaining to weigh in favor of the payments being from the tortfeasor, and not a collateral source. *See Reed,* 109 F.Supp.2d at 468; *Allen,* 639 F.Supp. at 1548. However, the rationale for finding this factor to weigh in favor of a source not being collateral is that the employer established the fund voluntarily and was not required to make the payments pursuant to a collective bargaining agreement. *See Allen,* 639 F.Supp. at 1548 (noting that no provision of the collective bargaining agreement required that the employer pay the insurance premiums); *Hall,* 322 F.Supp. at 96 (noting that the collective bargaining agreement required the employer to make the payments to the fund, and that the insurance policy "is in no sense a mere gratuity nor an

arrangement by which the company has undertaken *voluntarily* to indemnify itself against the possible liabilities to injured employees under the FELA" (emphasis added)). As the fifth circuit explained:

> On the one hand, an employer-tortfeasor who *voluntarily* undertakes to indemnify itself against liability by payment into a fund for that purpose, should not be penalized by permitting the plaintiff a double recovery of his benefits under the fund as well as his full measure of damages. On the other hand, where the employer-tortfeasor makes payment directly or indirectly into a fund *established for an independent reason,* or where such payment by the employer should be considered in the nature of a fringe benefit or deferred compensation, the employer should not be entitled to benefit by setting off such income in mitigation of his responsibility as a tortfeasor.

*Haughton,* 462 F.2d at 791 (emphasis added).

Although railroads do not make payments pursuant to the RRA as a result of collective bargaining, they are required by statute to make the payments. They do not make these payments to benefit themselves as protection from liability. *See Mikus v. Norfolk and W. Ry. Co.,* 312 Ill.App.3d 11, 244 Ill.Dec. 499, 726 N.E.2d 95, 113 (Ill.Ct.App.2000) (recognizing that railroads do not make payments pursuant to the RRA to indemnify themselves against liability); *cf. Global Petrotech, Inc. v. Engelhard Corp.,* 58 F.3d 198, 203 (5th Cir.1995) ("[T]he rule excluding evidence of a collateral source does not apply if the intended beneficiary of the collateral source is the tortfeasor."). Instead, the railroads' "participation in the retirement system is compulsory, a condition of employment." *Ruhl v. R.R. Ret. Bd.,* 342 F.2d 662, 666 (7th Cir.1965), *cert. denied,*

382 U.S. 836, 86 S.Ct. 81, 15 L.Ed.2d 78 (1965). Therefore, the same rationale behind finding that funds established pursuant to collective bargaining are likely to be collateral supports a finding that the RRA benefits are collateral. *See Falconer*, 397 F.Supp.2d at 147 ("If the employer made the payment because it was obligated to do so, the collateral source rule may apply"); *Melton*, 763 S.W.2d at 326 ("Unlike [a] voluntary contribution ... the contributions made to the Railroad Retirement Board which Railroad seeks to recover were required by federal law under the Railroad Retirement Act."); *cf. Folkestad*, 813 F.2d at 1380 (under the traditional collateral source rule, if "the tortfeasor *voluntarily* procures the insurance, the collateral source rule does not apply" (emphasis added)). We conclude that the fact that CSX contributed to the RRA Fund because of statutory requirement, and not as a voluntary attempt to insulate itself from liability for its negligence, weighs in favor of concluding that the payments Gardner receives from the RRA Fund are from a collateral source.

### 3. Injuries Covered by the RRA

As discussed previously, the RRA does not condition disability payments on the employee's injury being the result of a railroad's negligence or occurring while at work. *See* 45 U.S.C. § 231 a(a)(1)(iv), (iv). The fact that the RRA covers non-work related injuries cuts in favor of payments from the RRA Fund being collateral. *See Reed*, 109 F.Supp.2d at 468; *Allen*, 639 F.Supp. at 1548–49; *cf. Clark*, 726 F.2d at 451 (FELA case discussing section 55) ("A persuasive argument can be made ... that the disability benefits were exempt from setoff as a fringe benefit because they were payable regardless of whether the disability resulted from a job-related injury."). The rationale for this factor is that an employer would not normally be legally liable for an employee's non-work related

injuries. *See Davis*, 18 F.3d at 1245. Therefore, the fact that the RRA covers such injuries indicates that it is not intended merely to indemnify railroads, but is a part of an employee's compensation. This circumstance weighs in favor of concluding that the RRA benefits come from a collateral source.

### 4. Eligibility for RRA benefits

In order to qualify for RRA disability benefits, an individual must have been employed in the railroad industry for a certain number of years, the number varying with regard to the degree of disability and the employee's age. *See* 45 U.S.C. § 231 a(a)(1). Moreover, the amount of the annuity increases along with the employee's length of employment. *See* 45 U.S.C. § 231b(b)(1). This factor weighs in favor of a conclusion that the disability payments come from a collateral source. *See Allen*, 639 F.Supp. at 1549; *cf. Webber*, 307 F.Supp.2d at 125 (holding fact that payments were not contingent upon length of service weighed in favor of concluding that plan was not a collateral source). The apparent rationale is that this tie to length of employment again indicates that the RRA benefits are intended to reward employees for their years of service—the longer the length of service, the greater the award—and not to protect against legal liability. *See Laird*, 153 Ill.Dec. 94, 566 N.E.2d at 956 ("Railroad Retirement Act disability payments are considered pension benefits which amount to compensation for services previously rendered because it is the length of service and monthly wage rather than the extent of disability that determines the amount of the annuity."); *cf. United States v. Gallops*, 207 F.2d 48, 49 (5th Cir.1953) (in case under Federal Tort Claims Act collateral source rule applied because "payments were not in the nature of gratuities but were on

account of accumulation earned by plaintiff previously"). Indeed, the disability payments "have relation to the age provision of the [RRA] and there is no nexus between the purpose for which the contributions in this regard were made and the purpose for which the damages in this negligence action are awarded." *McCarthy v. Palmer*, 29 F.Supp. 585, 588–89 (E.D.N.Y.1939), *aff'd*, 113 F.2d 721 (2d Cir. 1940), *cert. denied*, 311 U.S. 680, 61 S.Ct. 50, 85 L.Ed. 438 (1940). We conclude that the provisions of the RRA making payment of disability payments contingent on length of employment weigh in favor of concluding that the disability payments are from a collateral source.

### 5. Specific Language in FELA and the RRA

Perhaps the most important of the five factors is whether specific language in the disability plan indicates that the parties intended that payments made pursuant to the plan should be setoff from a judgment in a tort action. *See Webber*, 307 F.Supp.2d at 125 (holding setoff inappropriate where "indemnification of the employer for liability was not a dominant purpose of the plan"); *Reed*, 109 F.Supp.2d at 468 (finding "dispositive the fact ... that DuPont had specifically provided for setoff in their policy"); *Allen*, 639 F.Supp. at 1548–49 (setoff is "clearly appropriate" where employer's intent appears in the disability plan). As neither the railroads nor the employees were a direct party to the drafting of the RRA, they cannot be said to have any intent with regard to whether RRA benefits should be setoff. However, the language of the RRA and FELA is clearly relevant to whether Congress intended for RRA payments to be setoff from a FELA award. As we discuss, *infra*, we conclude that the language of the applicable statutes evidences no Congressional intent that RRA pay-

ments be setoff against a FELA award. Therefore, this factor also weighs in favor of concluding that the payments are from a collateral source.

### 6. Balancing the Five Factors

After considering the five factors as they relate to the nature of the RRA benefits, we conclude that setoff is not allowed under the federal common law. All five factors weigh in favor of disallowing setoff. Although we recognize that these factors "must not ... be applied woodenly," *Davis*, 18 F.3d at 1244, the application of these factors clearly indicates the collateral nature of the benefits Gardner received under the RRA. Indeed, the only circumstance we have found that weighs in favor of finding that Gardner's disability annuities are not from a source collateral to CSX is that CSX contributed to the RRA Fund. However, the source of the payments is not determinative, and instead we are concerned with the nature of the benefits. Based on the nature of RRA benefits, we conclude that the district court properly denied CSX's motion for setoff pursuant to the federal common law relating to the collateral source doctrine.

### C. Distinguishing RRA Benefits from Other Disability Annuities

CSX has cited various cases in its brief in which courts have allowed a tortfeasor to offset payments the plaintiff received pursuant to a disability annuity. Although we do not feel it necessary to discuss in full each case, we will distinguish three cases representative of those relied on by CSX in order to demonstrate the difference between the situation at bar and other employer-employee arrangements under which the collateral source rule would not bar setoff.

In *Giles v. Gen. Elec. Co.*, 245 F.3d 474, 494 (5th Cir.2001), the court held that the trial court acted within its discretion in

setting off the plaintiff's disability pension and long term disability benefits against a front pay award under the Americans with Disabilities Act (the "ADA"). However, in *Giles,* the employer was not obligated to make the disability payments until after the injury, and would not have been obligated to make the payments had the plaintiff not been injured. *See id.* at 480, 495. Under the RRA, on the other hand, the railroad makes the payments into the RRA Fund on a yearly basis as a percentage of what the employee earned. *See* 26 U.S.C. §§ 3201 *et seq.* Thus, while the employer in *Giles* really was paying twice for the same injury, CSX is making no additional payments on Gardner's behalf under the RRA, and the fund itself is paying Gardner. Thus, although it may be true that railroads contribute the bulk of the funding to Tier II benefits, CSX neither paid this amount to insulate itself from liability nor will pay any additional amount into this account based on Gardner's injury. There simply is no prejudice to CSX by declining to set off the amounts it paid into the statutorily mandated retirement fund, as it was not "paying twice for the same injury." *Giles,* 245 F.3d at 495 (quoting *Davis,* 18 F.3d at 1244 n. 21.).

Similarly, in *McLean v. Runyon,* 222 F.3d 1150, 1156 (9th Cir.2000), the court determined that the collateral source rule did not apply and allowed the employer to setoff workers' compensation benefits received by the plaintiff from the Employee's Compensation Fund ("ECF") under the Federal Employee's Compensation Act ("FECA"), 5 U.S.C. §§ 8101 *et seq.,* against an award under the Rehabilitation Act, 29 U.S.C. §§ 701 *et seq.* However, the employer in *McLean* was required to reimburse the ECF for the payments

made to the plaintiff. 222 F.3d at 1156; *see* 5 U.S.C. § 8147(b). Therefore, had setoff not been allowed, the employer really would have had to pay twice for the employee's injury; once pursuant to the Rehabilitation Act, and again when it reimbursed the ECF. Here, on the other hand, CSX does not reimburse the RRA Fund for payments made to Gardner, and pays for the injury caused by its negligence once—pursuant to the FELA suit.

In *Szedlock v. Tenet,* 139 F.Supp.2d 725, 736 (E.D.Va.2001), *aff'd,* 61 Fed.Appx. 88, the court setoff the plaintiff's Federal Employees Retirement System ("FERS") annuity from her award for lost wages under the Age Discrimination in Employment Act ("ADEA").[9] The court based its holding on the "equitable nature" of back pay under the ADEA, and the fact that the FERS annuity payments came from the government, who was also the plaintiff's employer. *Id.* First, the ADEA contains a specific provision indicating the equitable and discretionary nature of awards for back pay. 42 U.S.C. § 2000e–5(g)(1) ("[T]he court may ... order such affirmative action as may be appropriate, which may include ... back pay ... or any other equitable relief as the court deems appropriate."). Therefore, courts have noted that under the ADEA, district and trial courts exercise discretion in determining the amount of an ADEA award. *See Knafel v. Pepsi–Cola Bottlers of Akron, Inc.,* 899 F.2d 1473, 1480 (6th Cir.1990). Further, courts that allow setoff of workers' compensation from back pay awards in ADEA cases note the similar goals of workers' compensation benefits and ADEA awards for back pay. *See Mason,* 817 F.Supp. at 557. As discussed more fully in other parts of this opinion, the purpose

---

**9.** Courts dealing with ADEA suits are split as to whether workers' compensation payments should be setoff from an ADEA back pay award. *See Mason v. Ass'n for Indep. Growth,* 817 F.Supp. 550, 556 (E.D.Pa.1993) (collecting cases).

and goals of FELA and the RRA are distinct. We find *Szedlock* and other cases decided under the ADEA distinguishable from the case at bar.

We recognize that even if setoff is not allowed pursuant to the common law, Congress is free to alter the common law. Therefore, we will proceed to examine the language of FELA and the RRA to determine if Congress contemplated that RRA benefits should be setoff from a FELA negligence award.

### V. Congressional Intent

### A. Operation of the RRA

As indicated above, railroads are required by federal law to pay taxes based on employee compensation. Railroads and their employees pay these taxes into a special account in the United States Treasury. 45 U.S.C. § 231n. "Like any scheme of social insurance, the amount of taxes paid on behalf of a particular employee does not necessarily correlate with the amount of benefits to which the employee may be entitled." *Vollmar v. CSX Transp., Inc.*, 898 F.2d 413, 416 (4th Cir. 1990). "Neither the employee nor the carrier is entitled to a refund of railroad retirement taxes paid on behalf of an employee who never qualifies for benefits." *Id.* Therefore, CSX was required to pay taxes based on Gardner's compensation into the RRA Fund regardless of whether Gardner ever became disabled as a result of CSX's negligence. *See O'Grady*, 857 F.2d at 391 ("The [employer] would have had to contribute to the Retirement Board and pay claimants' salaries if it had not wrongfully retired the [employees]."); *Melton*, 763 S.W.2d at 326 ("Railroad was responsible for those contributions to which respondent was entitled under the [RRA] whether or not he was injured on the job.").

■ In addressing the application of the collateral source rule in a similar, although not identical, context, the Supreme Court explained:

Payments of unemployment compensation were not made to the employees by respondent but by the state out of state funds derived from taxation. True, these taxes were paid by employers, and thus to some extent respondent helped to create the fund. However, the payments to the employees were not made to discharge any liability or obligation of respondent, but to carry out a policy of social betterment for the benefit of the entire state. We think these facts plainly show the benefits to be collateral.

*N.L.R.B. v. Gullett Gin. Co.*, 340 U.S. 361, 363, 71 S.Ct. 337, 95 L.Ed. 337 (1951); *see also O'Grady*, 857 F.2d at 391 ("[T]he payments to the Retirement Board were made to carry out a state policy under state law independent of ADEA back pay awards; they did not discharge any direct obligation from the [employer] to the claimants.") In the same vein, CSX helped create the fund from which Gardner received his benefits. Other railroads also contributed to the RRA Fund, as did Gardner, other railroad employees, and to some extent, the federal government. *See, supra*, note 4. CSX's mandatory contributions became part of the fund administered by an agency of the federal government for the benefit of all railroad employees, not merely those of CSX. When Gardner became disabled, he became entitled to an annuity in an amount based upon the length of his employment. As such payments are not contingent upon an employer's fault, it is difficult to see how the purpose of these payments could be to discharge an employer's liability. *See Gallops*, 207 F.2d at 49 (holding that the collateral source rule applied where payments made to plaintiff "were not made as compensation for the particular injuries suf-

fered but because of a pre-existing agreement based upon length of employment"). Instead, it is clear that Congress intended the RRA to further the public policy of protecting railroad employees who become disabled, on or off the job, and not to protect or reduce the liability of a negligent employer. *Cf. Global Petrotech,* 58 F.3d at 203 ("[T]he rule excluding evidence of a collateral source does not apply if the intended beneficiary of the collateral source is the tortfeasor.").

## B. Interaction of the RRA and FELA

■■■ As discussed previously, eligibility for a disability annuity under the RRA is not premised on an employer's negligence. Instead, a disability annuity "is the inherent right of the employee which becomes crystallized upon the occurrence of the designated prerequisites." *Hetrick v. Reading Co.,* 39 F.Supp. 22, 25 (D.N.J. 1941). In this sense, Gardner earned this annuity, and the payments are part of his compensation for his years of service. *See O'Grady,* 857 F.2d at 391. On the other hand, in order to be entitled to payment from an employer under FELA, the employee must show that the employer acted negligently. As the United States District Court for the District of New Jersey reasoned:

> The objects of the two pieces of legislation are entirely foreign to each other, and we are of the view that there never was a legislative intent that a jury ... was to draw into its calculations the annuities provided for by the Retirement Act so that payments made by the employer under the [RRA] would be returned to it.... [W]e do not feel that the annuity was ever intended to restore injured employees to a theoretical status quo, but on the contrary was intended to

make secure in society those employees suffering injury after thirty years of service, or perhaps because of thirty years of service. Recovery under [FELA] in such a case is beside the point, because that is an attempted restorative alone. *Hetrick,* 39 F.Supp. at 25; *see also Haynes,* 592 So.2d at 543 (explicitly adopting the rationale of *Hetrick*); *Melton,* 763 S.W.2d at 326 (quoting *Hetrick*). We likewise agree with the district court's reasoning in *Hetrick.* Congress did not pass the 1937 Act or the RRA in order to protect railroads from liability; it passed the RRA in order to ensure that railroad employees would be adequately compensated after they were no longer able to work in the industry due to age or disability. *Cf. Davis,* 18 F.3d at 1245 ("[T]he [RRA] does not appear to have been devised to reduce [employer's] legal liability for its employees' maladies. Rather, it is closely akin to a fringe benefit—part-and-parcel of its employees' compensation package."); *New York, New Haven, and Hartford R.R. Co. v. Leary,* 204 F.2d 461, 468 (1st Cir.1953), *cert. denied,* 346 U.S. 856, 74 S.Ct. 71, 98 L.Ed. 370 (1953) ("Accident indemnity strictly speaking does not seem to be within the Congressional intent disclosed in the Retirement Act of 1937.").

## C. Congressional Inaction

We also note that although section 55 is not applicable to payments under the RRA, section 55 clearly demonstrates that Congress was concerned with the interaction of the collateral source rule and FELA judgments. After judicial decisions made clear that railroads were not permitted to setoff of payments made pursuant to the RRA, Congress has amended FELA without addressing setoff of RRA payments.[10] *See* Pub.L. 103–272, 1994 HR

---

**10.** Also, the Locomotive Inspection Act, 49 U.S.C. §§ 20701 *et. seq.,* and the Safety Appli-

ance Act, 49 U.S.C. §§ 20301 *et. seq.,* have been characterized as amendments to FELA.

1758 (adding 45 U.S.C. § 54a); 62 Stat. 989 (1948) (amending 45 U.S.C. § 56). Also, Congress "fundamentally restructured the railroad retirement system" by enacting the RRA in 1974, including the elimination of "windfall benefits" received by certain employees who were receiving both railroad retirement and social security benefits. *U.S. R.R. Ret. Bd. v. Fritz,* 449 U.S. 166, 166, 101 S.Ct. 453, 66 L.Ed.2d 368 (1980). However, Congress did not address the purported "windfall" occurring when plaintiffs recover disability benefits that are not offset from a FELA award.

Taken together, Congress's inaction with regard to setoff of payments made pursuant to the RRA along with its action with regard to other provisions of FELA and the RRA may give rise to the inference that Congress is satisfied with the courts' decisions disallowing setoff. In *Gullett Gin Co.,* 340 U.S. at 365–66, 71 S.Ct. 337 the Court noted that when Congress amended the National Labor Relations Act in 1947, the NLRB had been disallowing deduction of unemployment compensation, and two federal courts had sustained the board's action. "Under these circumstances it is a fair assumption that by reenacting without pertinent modification to the provision with which we here deal, Congress accepted the construction placed thereon by the Board and approved by the courts." *Id.* at 366, 71 S.Ct. 337; *see also Elec. Storage Battery Co. v. Shimadzu,* 307 U.S. 5, 7, 613, 616, 59 S.Ct. 675, 83 L.Ed. 1071 (1939) ("Congress has not seen fit to amend the statute in this respect and we must assume that it has been satisfied with, and adopted, the construction given to its enactment by the courts."); *Kukman v. Baum,* 346 F.Supp. 55, 64 (N.D.Ill.1972) (presuming that Congress is aware of judicial construction of its acts, and indicating that Congress's failure to amend a specific statute when enacting amendments to other parts of an act "is persuasive evidence of adoption by Congress of the judicial construction"); *Miller v. Union Pac. R.R. Co.,* 147 Cal.App.4th 451, 53 Cal.Rptr.3d 893, 897 (Cal.Ct.App.2007) (noting that "Congress has amended the FELA numerous times, most recently in 1994, and has never provided for expert witness fees").

### Conclusion

A strong basis exists for affirming the trial court based merely on federal precedent indicating that *Eichel* controls the outcome of this case. However, we do not affirm the trial court based solely on *Eichel,* and instead conclude that the federal common law and our interpretation of FELA and the RRA indicate that the collateral source rule prevents CSX from setting off disability payments made to Gardner under the RRA from the FELA award. We recognize that as a result of the trial court disallowing setoff, Gardner has been made more than whole. This situation is common under the collateral source rule, and CSX's argument that such overcompensation is unjust is not persuasive. The solution to this overcompensation is not to reduce a negligent employer's

*Urie v. Thompson,* 337 U.S. 163, 189, 69 S.Ct. 1018, 93 L.Ed. 1282 (1949). Congress has revised these acts several times after case law

established that railroads may not offset payments made pursuant to the RRA from a

liability.[11] We conclude that the trial court properly denied CSX's motion for setoff.

Affirmed.

VAIDIK, J., and BRADFORD, J., concur.

FELA award. *See* Pub.L. 103–272, 1994 HR 1758.

**11.** *See O'Grady,* 857 F.2d at 391 ("It is true that the former [employees] have received both the benefits of working and not working … perhaps … claimants should be required to return to the Retirement Board the pension benefits they received.").